Hemphill, Ch. J.
The first question presented by this document is to its-admissibility in evidence. The paper, as presented, is a certified copy of a document deposited in the General Land Office. By law, the copies of records-of all public offices and courts, certified under the band and seal (if there be one) of the lawful possessor of such record, shall be admitted as evidence where the records would themselves be admissible. (Dig., art. 744.) Tlie ouly question ordinarily ax-ising, whore a duly certified copy of a record is presented, is as to tlie admissibility of the original record. But wc are met in this case by the preliminary objection that this document, though deposited in tlie land office, was improperly there, and enn-u ¡luted. no portion of its records, andr consequently, that a certified copy from the keeper of such records could not be read in evidence. This objection nri=t lie tested by the laws describing the papers which are required to be deposited in tlie laud office.
By tlie Cth section of tlie act of December 14,1837, (Dig., art. 1842,) the Commissioner of the General Land Office was declared to he entitled to the custody and control of all hooks, records, papers, and original documents appertaining to the titles of lands heretofore aud by the provisions of law denominated archives ; and that the said hooks, records, papers, and original documents shall! become and be deemed tlie books and papers of tlie said office. There are various other provisions of law in relation to the papers which shall form tlie records of tlie General Land Office, and which, in substance, accord with the section cited. (See Dig., arts. 1786, 1819, 1835, 1820.)
A paper, then, to be entitled to admission into the General Land Office, must have constituted an archive or record of some former office. It is imtna- *179 terialin whose possession the paper may have been before its deposit, whether in that of l-an empresario, political chief, alcalde, commissary, or commissioner for issuing- land titles, or of any other person, (art. 1786,} provided it shall have been an archive, or an original document or register in some office, and appertained to the lands of the Republic.” This document lias no claim to the character of an archive. Tt was the property of the, plaintiff. It purports to be a copy from the archives in Monclova; was issued to the individual, at his request, for his protection, and to serve him as the evidence of his title; and was not deposited as an archive in any public office which had existed anterior to the creation of the General Land Office. There was error, then, in overruling the objection to the admission of the certified copy in evidence.
This paper was also registered in the office of the county clerk of the county of Bexar; and the-record was introduced on the trial. There does not appear to have been any formal objection made to this proof, but it may be considered as embraced in the exception, which extends not only to all copies of the document, but to the. admissibility of the original itself. In the argument of the appellants, if is contended that the document was not admissible to record in the office of the county clerk under the statute regulating the registry of deeds, conveyances, &c.
The provisions of the law of 1S36, under which this title was registered, are not a little, obscure; and such interpretation, consistent with the intent of the act, should be given as would secure the registration of the titles under which persons owned or claimed their lands. The 35th section (art. 2752) authorizes the record of any instrument required to be recorded; provided one of the witnesses of the number required bylaw shall swear to the signature of the signer or he shall acknowledge the same. By section 3S, (art. 2755.) it is declared'that titles, &c., cannot be admitted to record unless proved by at least two subscribing witnesses, if living in the county; if not so living in the county, that the handwriting shall be proven, and in all cases the certificate of any county judge, that the witness appeared before him and acknowledged his signature, or that the. handwriting of the same was duly pn ved, shall be sufficient evidence to authorize the cleric of the County Court to enter such title, &c., upon record. •The first section cited requires one witness to swear to the signature of the signer. The second requires proof by two subscribing witnesses, if living in the county; if not so living, then the handwriting must be proven; hut the handwriting of whom, whether of the witnesses or'of the signer, is not stated; and the phraseology is then immediately changed from the plural to the singular number, and the acknowledgment of the said witness or the proof of his handwriting is held to he sufficient.
The first requires proof of the signature of the signer. The second, at least in its last provision, is satisfied with proof of the signature of the witness.
In the first, the witnesses are not specially described as subscribing witnesses; and, it is probable, that, upon this construction, proof was admitted by the clerk of the signature of the signer as sufficient proof to admit the paper to record. This may be deemed a departure from the literal import of the terms employed in 'the statute, but it accords with its spirit and intent. Its object or policy was to reqtfi 'e evidences of claims to lands to be spread upon a public record, so that third persons might be satisfied of their existence and of the titles by which they were supported; and if the instrument under which title is claimed he legal and authentic without subscribing witnesses, it would require language too plain to he mistaken to exclude it from record for the want of proof by such witnesses, the signature of the signer being substantiated by satisfactory proof.
But if tlic original itself would be inadmissible, the record copy would, as a consequence, be excluded; and I will proceed to consider the question which has been raised and argued, as to the admission of the paper had the original been introduced.
*180 The document was furnished one of the plaintiffs, on his application to the ■Governor of Coahuila and Texas, stating the loss of the testimonio which had been issued to his ancestor, and praying that the archives be searched and a legalized copy made. The Governor decrees accordingly, and the copy is certified by the Secretary of State, in the usual form. By article 46 of decree 19 and article 139 of the Constitution of the State of Coahuila and Texas, the Secretary of State had charge of all kinds of business whatever pertaining to the executive department; and by article 141, Constitution, all copies were directed to be authorized, that is, officially certified, by the secretary, otherwise they were not to be productive of faith.
This copy purports to have been issued at a time when there was no adverse claimant to the land. The lands were comprised within the jurisdiction of the former province of Coahuila, of which Cordero was governor at the date of the title ; and if it be admitted that the original papers, the archives of the provincial governor, were deposited in the executive department of the State of Coahuila and Texas, (and this is the prima f zcie presumption,) and it was proven on the trial that their proper place of deposit was in Monclova, it. seems clear that a copy of an archive in the legal custody of the secretary, duly attested by him, would, at the time it was furnished, have been evidence of a primary character to have established the existence of the original, and must still, unless prohibited bylaw, furnish evidence of such fact, although, under the rules of evidence governing the forum, it may be regarded as secondary or prima facie, liable to be rebutted by circumstances raising a presumption against the existence •' the title.
Then.; are, in point of fact, but few entirely original protocols or matrixes of title in Texas. The protocols of empresario contracts, or the commissions of commissioners or alcaldes, to make titles to colonists, settlers, or purchasers of executive decrees for the augmentation of headrights, remain in the archives of the executive department of the State of Coahuila and Texas. If a title emanated by virtue of such certified copies of authority, the copy remained with the officer, and this, together with the protocol or register of the title issued, constituted an archivo of his office, and which was subsequently, by law, transferable to the General Band Office. A portion, then, of the archive in the General Land Office, its basis, is but a copy; and parties who claim under it encounter the difficulties raised to the admission of this document, with the exception that this is not the testimonio or second original issued to the party at the date of the grant, but a second copy from the original on record.
The party who claims under a title archived in the General Land Office has also this difference in his favor, that the officer to whom .the copy was directed was the judge of its genuineness, and his action by virtue of such authority is evidence that in his judgment such decree, concession, or grant existed; and this would afford strong if not conclusive proof of such fact. So that upon the whole it may be said that there is a strong if not a conclusive presumption in favor of the existence of the originals and parts of originals of all titles on deposit in the General Land Office. The questions in relation to testimonios, or the second originals of titles, conveyances, &c., and in relation to archives, have been discussed in the case of Smith v. Townsend, (Dallam, 559,) and Houston v. Perry & Williams, (5 Tex. R..) and the principles there stated have been affirmed in tlic case of Herndon v. Casiano, decided at this term of the court.
Recurring to the general question as to the effect in evidence of a copy of a record duly certified by the officer holding the original in legal custody, it will be remembered that the copy before us is not attested by an officer of a foreign, but of a former Government, and that the archives from which it purports to be taken constituted, at the time it was issued, a portion of the archives of the country. Had the former laws and rules of evidence anterior to the *181 Revolution continued in force, this paper, from its authorization by the Secretary of State, would have been classed as an authentic, in contradistinction to public or private instruments. Such instrument is defined to be a document authenticated by the spal of the king, prince, archbishop, bishop, cabildo, duke, count, marquis, or any other person in authority. To this class belong writings made out by the notaries or secretaries of the cabildo or ayuntamiento, in matters pertaining to such body, and also “copies which the keepers of public archives take from the writings or papers of the archives, under the command of the kiugor judge having competent authority for that purpose; ” and that such copies are entitled to faitli in or out of court, or, in other words, constitute full proof, see Diccionario de Legislation, verbo Instrumento Autentico ; Febrero Novissimo, tol. 1, p. 221; ‘Partidas, 8 1., 1 tit., 18; Comments of Gregorio Lopez.
If we refer to the rules of the common law on the subject of evidence, (and these were made in force in 1836,) it seems that this document, though not primary, is secondary or prima facie evidence of the existence of the original.
The questions arising on the admissibility of certified copies from public archives have been the subjects of repeated discussion in the Supreme Court of the United States, and several of the cases were referred to in the case of Smith v. Townsend, (Dallam, 569; 7 Pet. R., 85; 9 Id., 624, 625, 732.) These were cases in which the originals were deposited and retained by law in a public office, the party interested being entitled to and receiving only a certified copy, and it was held that the copy was admissible without accounting for the non-production of the original.
In the case of The United States v. Wiggins, (14 Pet. R., 334,) the claimant relied upon a certified copy of a testimonio of a concession by tiie Spanish authorities, the original of which could not bo found among the archives, nor was its existence proven. A clerk in the secretary’s office in which the archives were deposited, and who liad kept them for six years, testified that he had never seen or heard of the original. The surveyor general never saw it, nor was it enumerated in the list of documents made soon after the change of flags. Yet, notwithstanding this negative proof, the testimonio or certified copy, on proof of the signature of the officer and corroborated by other circumstances, was deemed sufficient evidence of the existence of the grant and that an original had ouco existed.
The duties •incumbent on the Secretary of the Government of Florida, as to giving copies of papers uuder his charge, were parallel with those .of the Secretary of the. State of Coalniila and Texas. In either case they were the trusted agents of the law for the particular purpose. In their opinion they say: “ It follows in this ease, as in all others where the originals are confined to a public office, and copies are introduced, first, that the copy is competent evidence by authority of the certificate of the proper officer; and, second, that it proves prima facie the original to have been on file in the office where the copy was made, and for this plain reason the officer’s certificate has accorded to it the sauctity of a deposition.” The court further say that, in the Perchman case, much reliance was placed upon the acts of Congress to give effect to the certificate of the officer, and to authorize the admission of the certified copy, without accounting for the non-production of the original, but that such would have been the rule on general principles and without the aid of legislation.
In the case cited, the evidence to rebut the, presumption of the non-existence of the original was, that the paper had not been carefully kept; that a survey had been made upon it six years after its date, and that it had been prosecuted before the board of commissioners for the investigation of Spanish titles; and it was said that if the unsupported certificate had for the first time been brought forward eighteen years after its date, it could not have furnished any foundation for a decree or been evidence worthy of credit. The circum *182 stances in this case afford much stronger ground for the presumption of the existence of the original than in tiie cáse which lias been cited. The claim of the plaintiffs to the land had been, from the evidence of the witnesses, notorious and long'continued. Tiie title had always been respected by the Mexican and Spanish Governments. The ancestor of tiie plaintiffs had disposed of them by his will, and they wore treated as a portion of his succession. The document was proven before the comity clerk in February, 1837, though not filed for record until February, 1839.
Had the original testimonio, or second original, as it is sometimes called, been produced, and the signature proven, it would have been of itself at least prima facie evidence of title, and, supported by the circumstances adduced in evidence, it would have afforded full proof; and I am strongly inclined to the opinion that, under the facts of this case, the copy as certified furnished prima facie evidence of the existence of tiie original, which was not rebutted by circumstances raising a counter presumption. But an expression of a positive conclusion on this point is waived. We all concur as to the effect of a testi-monio in evidence, but perhaps there might not he an entire unanimity of opinion as to the effect of a second certified copy of tiie original remaining as ail archive iu a now foreign country.
It must be remembered in all cases of this character that the party is not entitled to tiie possession of the original. He can, by no possibility, have control over it, for tiie reason that it is not liis property, but constitutes an archive of a public office. It would be just as reasonable to require a patentee under the Slate to produce the hook from the General Land Office in which ids patent may be recorded, as to require a party holding a testimonio, or copy of title, under the former Government, to produce the original instead of tiie testimonio or copy, neither the one or the other having ever been, or by law could be. in tiie possession nor under the control of tiie claimant. The. proper disposition of questions of this character, so as to attain tiie ends of justice, where the original archive remains abroad, is environed with difficulties. If testimonios or copies are admitted without restrictions, a wide door is opened for the admission of fraudulent or forged titles. Their falsity and lief i-tious diameter cannot be tested by original records or evidence within the limits of our own jurisdiction. But, on the other hand, when the former Government was overthrown and the now sovereignty was created, the testimo-nios or copies were the only evidence of title which individuals had in their possession.
They were issued to serve them, in the language of the law, for title. They constituted at their date authentic evidence of right, requiring no adventitious aid for their support. If, as a consequence of the Revolution, the country was divided — the archives remaining in one jurisdiction and tiie claimant, with ids testimonio or copy title, falling in another — is, therefore, this evidence of title to be deprived of all force and effect? Is such, tiie necessary result of the forcible separation between tiie archive and the copy, effected by the Government to which he is attached?
By modern usage the effect of Revolution is not to divest tiie inhabitants of their property or to destroy private rights. But could a more sweeping mode of confiscation he adopted than by a destruction of the evidences of title or an extinguishment of their force and effect? Ho doubt the rules of evidence may be changed. The instruments of title in a party’s possession may he required to he recorded once or twice or several times. Barriers may and should be erected against fraud, perjury, and forgery. But these are designed for the protection of the public and of honest bona fide claimants. They cannot bo used to assail and demolish the only safeguard — tiie only vestige of title by which an individual is secured in his property, the only instrument of evidence which he could lawfully hold — without the substitution of some other practicable mode of substantiating iiis claim. The Government have it now *183 ■at least in their power to protect the country against fraud, by procuring authenticated copies of the archives in Saltillo, Monolova, Victoria de Tamauli-pas, or elsewhere, or some sufficient evidence of the titles which were issued within the now territorial limits of tins State. It is admitted that we must he controlled by the common-law rules of evidence. See the cases of Lewis et al. v. The City of San Antonio and Herndon v. Casiano, decided at this term. These rules affect the remedy, the procedure; and the Legislature may modify ■them at pleasure, provided that such changes come not within the constitutional inhibition against laws impairing the obligation of contracts or which .are retrospective in their operation. Laws affecting the remedy are generally not within the scope of this inhibition, but they may become so by impairing ■•or destroying a right. The question of what constituted a retrospective law within the intent of the inhibition was discussed, at some length, in the case of De Cordova v. The City of Galveston, decided at December Term, 1849. (4 Tex. R., 470.) Mr. Justice Story defines a retrospective law to be, one which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, or imposes a new duty, or attaches a new disability in relation to transactions already past. (2 Gall. R., 105.)
There are limits to legislative power, as well over rules of evidence as upon other subjects. However enlarged may bo the powers of this branch of the •Government, yet they cannot pass beyond the coniines of the Constitution; and tlio guarantees by which, under this instrument, the rights of all are se-•eured cannot be successfully violated or assailed.
But, were the certified copy in tills case treated as the act of an officer of a foreign Government, its admissibility or effect is by no means a settled question ■of common law and on the principles of international jurisprudence. Whether the rules of evidence of the forum are to be exclusively observed or whether those •of tiie foreign country are to have weight, was considered by Mr. Justice Story .as an embarrassing question, and which was not settled. (S. Coüf. L., ■see. 634 a, 637, and cases cited.)
It is contended that the judgment is erroneous, on ihe ground that the title ■ of the. plaintiffs is inchoate and imperfect, and will not, therefore, authorize a recovery.
If this bo the character of the title, if it did not vest a perfect right in the .grantee, and divest the Government of its right in the lands, then there is an end of tliis controversy, for it is no longer an open question that an imperfect title, emanating from a former and unrecognized by the existing Government, •forms no foundation for an action.
The Constitution of the Republic expressly declared that no future survey •or title should he valid unless sanctioned by the convention or some future law by the Congress of the Republic. This is an authoritative declaration of the •acknowledged general principle, that the primary control over the public domain belongs to the legislative branch of the Government, and that the obligation to respect and complete the incipient titles emanating from a former sovereignty rests exclusively upon the political authority. By this they may be altogether disavowed, or they may he recognized with or without conditions or restrictions. The claimants may be required to prove only the original .genuineness of the claims, or they may, as in the case of headlights, he required ■to prove continuous residence and patriotic acts and services. It mattered not whether the claims liad been previously surveyed or not, although the claimant had been for years in the actual occupation and possession, yet they were required to appear before hoards of commissioners, and prove that there rights had not been forfeited by abandonment and by refusal to participate in the struggle against the enemy. These or other conditions might have been imposed on other classes of claims, or they might have been disaffirmed altogether; • and the want of recognition of an imperfect claim lias, as long as it continues, the same effect upon its judicial standing as a positive disavowal. If this were mot the case, the policy of the constitutional reservation might be en *184 tirely defeated. Its manifest purpose was to retain legislative control over the public domain, whether it be entirely vacant or claimed by a survey or more imperfect equity. But if suits could be maintained by virtue of such surveys and imperfect titles, then there would be no special necessity for a patent or final relinquishment of tiie right of the State. Until this be done, the legal or-superior title remains in the Government, and this may be transferred gratuitously or on onerous conditions. But if imperfect titles were judicially recognized, the burthensome conditions might be evaded by all holding surveys refusing compliance with the requisites for a perfect title, in tiie meantime enjoying all its immunities under their inceptive equitable claims. Such judicial action would directly interfere with tiie policy of the law and with the-just power of tiie political or sovereign authority over tiie public domain; and therefore the rule lias been adopted and sanctioned, that such imperfect claims--have, proprio vigore., no standing ill a court of justice.
If it were otherwise, and wore this an imperfect title, by what rule would! the merits of the claimant be tested by a court of justice? Would it be by tiie customs, laws, and usages under which tiie title had its origin, or by the requisites imposed upon lieadright claimants before boards of commissioners?' If by the latter, its failure would be signal, for the want of the continued residence of the applicant in the country.
But, to proceed with tiie consideration of the question as to the character of this title, an imperfect title is one which requires a further exercise of the granting power to pass the fee in the lands, which does not convey full and-absolute dominion, not only as against all private persons, but as against the-Government, and which may consequently be affirmed or disavowed by the-political or granting authority.
It will, not be necessary in this case to enter into a disquisition as to the-extent of the power of tiie Governor of tiie province of Coahuila to grant lands in 1807. The title shows upon its face that his act was not the final exercise of the granting authority over the lands. It is triie, that he adjudicates them to the applicant, orders their survey, and that the party be put in possession, and that all these measures were fully executed ; but he further directs the grantee to apply at tiie intendancy of San Luis Potosí to obtain titles of confirmation, and this, in conformity with the royal cédula of tiie 14th-October, 1805. It appears from the title itself that, by a royal order of a late-date, tiie Governor did not possess the power of complete alienation over the-public domain; that his authority was limited to tiie incipient measures in the-transfer of lands, and that lhese were subject to the revision, and necessarily required tiie approval of a superior authority. The royal order, referred to in-the title, has not been produced, nor has it been accessible to the court; but, with reference to the power of the iutondant over the. public lands, it cannot materially vary from the provisions of the general law, viz, the royal ordinance for tiie establishment and instruction of the intendants of the army and -province of New Spain. By the eighty-first article of this ordinance, it is declared that “the intendants shall be exclusive judges of the canses and questions that may arise in the district of their provinces about the sale, composition, and grant of royal lands and of seiguory, it being required of their-possessors, and of those who pretend to new grants of them, to produce their i-ights and institute their claims before the said intendants, so that these matters, being legally prepared, in conjunction with a promoter of my royal treasury, may'be decided upon, the opinion of their ordinary assessor being heard, &c.; and they may admit appeals to the superior junta cle hacienda, or, if the-parties interested do not appeal, they shall communicate to it the original proceedings, for its information, when they shall judge these proceedings ready for tlic issuing of tiie warrant. Both being seen by the junta, they shall be re-returned, and the warrant issued, unless some difficulty occur, and then, before executing it, tiie measures found to be neglected by the junta shall be- *185 observed. The proper confirmations shall, in consequence, be furnished by the same superior junta, in due time, which shall proceed in the ease, as also-the intendants, their sub-delegates, and others, in conformity with the royal regulation of the loth October, 1754, as far as it may not be .opposed to the-requirements of the latter, without losing sight of the wise dispositions of the laws cited therein, and of the 9th, title 12, lib. 4.”
No proof has been made; of the usual action of the intendant at San Luis Potosí on concessions, orders of survey, on incipient grants of land emanating from the governors of provinces within the limits of his intendancy. No copy of instructions which may have been issued by him for the information and direction of the sub-delegates and others has been furnished, and for the decision of this cause it is not. necessary that they should be known; for tlie only question here is. Was tlie act of the Governor final, or was it under the control of the intendant, depending for its validity upon his confirmation; was it one-which tlie latter could have affirmed or disallowed; might the grantee have been retained or lawfully turned out of possession ?
This question has been decided by the Governor himself. He does not assume-to exercise conclusive authority. The grantee is expressly referred to a superior officer for confirmation.
If we say that the act of the Governor is final, we must assume, contrary to-the usual presumption, that he was ignorant of the extent of his authority and of the laws under which he was acting. If he were,-in point of fact, mistaken, if no act of tlie intendant were necessary to pass full title, his mistake should not operate to the prejudice of the grantee. But so far as we are informed of the laws then in force, they were not misunderstood but correctly interpreted by the Governor. The intendant, in the language of the ordinance, was made the exclusive judge of causes and questions arising about the sale, composition, or grant of lands.
In the absence of instructions from the intendant at San Louis Potosi, we may refer to those of other intendants, acting under the same laws, as to the extent of their authority and the character of the rights acquired by grantees-under concessions from governors of provinces acting as sub-delegates, &c. The ability and the intelligence of Morales, intendant of the provinces of Louisiana and West Florida, cannot be doubted, and in his regulations and instructions he says, that “ experience proves that a great number of those who. have asked for lands think themselves the legal owners of it — those who have-obtaiued the first decree by which the surveyor is ordered to measure it and put them in possession; others, after the survey has been made, have neglected to ask the title for the property; — and as like abuses continuing for a longer time will augment the confusion and disorder which will necessarily result, we declare thaUno one of those who have obtained the said decrees, notwithstanding, in virtue of them, the survey has taken place and that they have been put in possession, can be regarded as owners of the land until their real titles are-delivered, completed with all the formalities before recited.” (2 White Recop., 239.)
The intendants were directed to conform to the regulations of October 15,. 1754, so far as they were not repugnant to the law on the subject of intendants.. This regulation throughout shows that confirmation was necessary to perfect title, unless long possession gave title by prescription. Fifty-four years was the limit of prescription under this regulation, which would work confirmation of title. But all who possessed lands by sale from sub-delegates subsequent to-1700, and whose titles had not been confirmed, were required to apply to the proper authorities for that purpose. (2 White Recop., p. 64.)
The point under discussion has been repeatedly considered in the Supreme Court of the United States. It was again fully examined in the case of Menard’s Heirs v. Massie, (8 How. R., 293.) The title in that case is not materially different from the one under consideration. The lieutenant governor grants the land solicited b}r the petitioner. Tlie surveyor general is directed to execute the survey so as to enable the party interested to solicit the title in *186 due form from the inteudant general. It was held that such title was imperfect ; that it did not make the party owner; and that, without the further act of the inteudant, the title continued in the crown. It was said that the lieutenant governor did make concessions, directed lands to he surveyed, and caused grantees to be put into possession, but this did not give such vested title as might not be legally disavowed by the Spanish Government; that such claims depend for their sanction and completion upon the sovereign power, and have no standing in an ordinary judicial tribunal until they are confirmed and the legal title'vested in the claimant. (5 Mo. R., 514; 7 Id., 10; 6 Id., 570; 4 How. R., 549; Dallam, 381, 524; 1 Tex. R., 771, 790; 2 Id., 1; Id., 357; 3 Id., 135.)
Note 5G. — Titus v. Kimbro, 8 T., 210; De Leon r. White, 9 T., 598; Word v. McKinney, 25 T., 258; Andrews v. Marshall, 2G T., 212; Hatchett v, Conner, 30 T,, 104; Wood v. Wilder, 42 T., 896.
Note 57. — Herndon v. Casiano, ante 318; Watson v. Chalk, 11 T., 89; Guilbeau v. Mays, 15 T,, 410; Byrne v. Fagan, 16 T., 391; Nicholson -y. Horton, 23 T., 47; Lambert v Weir, 27 T., 359; Hatchett v. Conner, 30 T., 104.
Note 58. — Paschal v. Bangerfield, 37 T., 273.
Those views are decisive of the character of this title, and that it is such as will not support an action or authorize a recovery. Ho attempt was made to show that the power of the inteudant liad subsequently vested in the Governor ■or commandant general, or in any other officer, or. if it had, that the title had been confirmed by any such officer. In relation to the presumption of confirmation by lapse of time, it is sufficient to say, to whatever extent this may be lawfully indulged in support of an actual occupation with claim of ownership, yet it cannot arise, at least until a much longer period has elapsed, from such acts of ownership as are proven in the present case.
Several other points have been discussed bjr counsel, with extraordinary ability, zeal, and research. Their luminous arguments have thrown much light on the intricate questions involved in causes of this character. But the pressure -of other important causes forbids, for the present, an investigation of those points; and they must be reserved for cases in which their examination becomes necessary to the decision.
In this case there was judgment .for S. Jett, one of the defendants. It is ordered, adjudged, and decreed that the judgment, except such portion as in favor of S. Jett, be in all tilings reversed, and that the cause be dismissed.
Reversed and dismissed.