## COOSA RIVER STEAMBOAT CO. *vs.* BARCLAY & HENDERSON.

[ACTION ON THE CASE AGAINST COMMON CARRIERS.]

1. *Retroactive statutes.*—It is not within the power of the legislature to take away vested rights, nor to create a cause of action out of an existing transaction, for which, at the time of its occurrence, there was no remedy ; but it may, consistently with the constitution, alter, enlarge, modify, or confer a remedy for existing legal rights : such statutes, relating only to the remedy, operate generally on existing causes of action, as well as those which afterwards accrue.

2. *Attachment against foreign corporation.*—An attachment lies against a foreign corporation, under the act of 1854, (Session Acts 1853-4, p. 29,) on a cause of action which arose prior to the passage of the statute.

3. *Liability of common carrier.*—How far a common carrier is responsible for an injury caused by his boat striking an invisible and unknown snag, deposited by a recent freshet, in the usual channel of the river, *quære?* (RICE, C. J., and STONE, J., differing in opinion ; and WALKER, J., not sitting.)

4. *Freight bill not bill of lading.*—An account for freight, usually called a freight bill, is not a bill of lading.

APPEAL from the Circuit Court of Cherokee.

Tried before the Hon. JOHN E. MOORE.

THIS action was brought by Barclay & Henderson against the appellant, a corporation chartered by the State of Georgia, to recover damages for injuries to certain goods which the defendant, as a common carrier, undertook to transport down the Coosa river, from Rome to Greensport; and was commenced by original attachment on the 23d February, 1854. The pleadings showed that the injury complained of occurred on the 28th September, 1853; and thereupon the defendant moved to quash the attachment, on the ground that there was then no statute of this State giving an attachment in such case against a foreign corporation. The court overruled the motion, and the defendant excepted.

On the trial, the plaintiff proved that the defendant was a foreign corporation, chartered by the legislature of Georgia, and carried goods for hire, by steamboat, on the Coosa river; that W. S. Cothran & Co. were defendant's agents at Rome, Georgia. They then offered to read in evidence to the jury, after proving the signature of W. S. Cothran & Co., the following instrument:

"Mess. Barclay & Henderson
1853.                    To Coosa River S. B. Co.
Sept. 28.   Freight per steamer *Georgia* to Greensport.
            11 trunks, 17 boxes, 1 hhd. 250, - - - $17 50
            1 box scales, ½ bl., 1 tierce, 4 —, - -    3 00
            1 bl. measures, 1 bl. tubs, 1 bl. shovels,   90
Paid railroad bills, - - - - - - - - - - - - - - - - - 91 17
                                                     ─────
                                                     $112 57

"Received of Barclay & Henderson the above bill of freight, this Oct. 4th, 1853.
                    (signed)     A. H. L. WOOD.
                        ˙ Rome, Sept. 28th, 1853.
    "Mess. Barclay & Henderson:
                    Above find freight bill of goods left here this morning on steamer *Georgia*, which, we trust, will be safely landed at Greensport, on to-morrow, or next morning.
    Respectfully, &c.     W. S. COTHRAN & Co., Agents."
    9

The defendant objected to the admission of this as evidence; but the objection was overruled, and an exception reserved. Plaintiffs also proved that the goods, when delivered at Greensport, were wet and damaged. On the part of the defendant, it was shown that its charter authorized it to use lighters in the transportation of goods, and that it was customary with steamboats on the Coosa river to do so; that the steamer Georgia, when plaintiffs' goods were received at Rome, was some distance below, and could not come up to Rome on account of the low stage of the water; that the goods were put on a lighter, and carried down to the steamboat, when a portion of them were put on the boat, and the lighter attached to the side of the boat; and that, after they had proceeded about thirty miles down the river, the lighter struck a snag, and the goods on board were wet and otherwise damaged. The bill of exceptions then proceeds thus:

"At the place where the lighter struck the snag, there was an island. The channel was narrow, (about fifty feet,) and the current rapid. Next to the island, and on the east side, was a sand-bar; and on the west side was a log, lying up and down the stream, about two feet from the bank, and a known and visible snag above the water, projecting perpendicularly from it. This log lay near the edge of the deepest part of the channel of the river; on that side, the water was deep near up to the log, but grew more shallow from the log to the bank. A short space above this were grapevines, on and near the bank; and drift-wood, fastened thereto, on the bank, and on the same side of the river. There had been a slight freshet some days previous to the accident, and a swell in the river of two feet rise. It was shown that this log had been long known to defendant's agents; that the log, grapevines, and drift-wood could have been removed by human means, and had been removed since the accident. After the accident, the lighter sunk; and the goods were rescued, and carried to Greensport with due diligence and dispatch. When the accident occurred, the witness did not see the snag on which the lighter struck; but on his return, two or three days afterwards, the boat was

stopped at the place where the accident occurred, and, on examination, they found that the known and visible snag bore no marks of a violent and recent collision, but that there was another snag, invisible, and before that time unknown, which was about twelve inches under the water, and the end of which seemed broken and torn, as if from violent and recent collision. One end of this snag was stuck in the mud in the bottom of the river, and the other end was standing out some twelve inches below the surface of the water, about six feet further in the channel of the river than the known snag, and held fast in its place by a limb projecting downwards from the lower side of the other snag; and, in the opinion of the witness, the unknown snag could not have remained there but for the other snag. Where this snag was, the channel was deep, and the current rapid. It was regarded as a dangerous place; and the boat, in passing, usually lessened her speed to one half, and did so on this occasion. The river rose soon after the accident; and the defendant could not examine for the unknown snag until the next summer, when it could not be found. The boat and lighter were shown to be staunch and well-built, and had on board a sufficient number of skillful and experienced officers and men, who used due diligence in passing the place where the accident occurred. At the time of the accident, the boat and lighter were passing in the usual channel of the river, where they had uniformly passed in safety, and where they had passed on the previous trip, about eight days before the accident happened."

The court charged the jury as follows:

"The defendant, being a common carrier, is responsible to the plaintiffs for whatever loss they sustained by the damage to their goods, unless it is shown that the accident was occasioned by some act of God, or of the public enemies. The defendant alleges, that it was owing to the act of God, in sending a freshet, and, along with it, the snag in question. It is for the jury to decide whether the loss is to be attributed to that inevitable necessity which no human prudence could have avoided, and which could not have been occasioned by, or arisen from the interven-

tion of man. It is no excuse for a common carrier, that the act arose from the act of God, if occasioned by his negligence. The act of God excludes all idea of human agency; and no matter what degree of prudence may be exercised by such carrier or his servants, although the delusion by which it is baffled, or the force by which it is overcome, be inevitable, yet, if it be the result of human means, the carrier is responsible. In looking at the loss, the jury must take all the circumstances and causes into the account, so as to determine whether it could have been guarded against by the defendant. Did the known snag exert a considerable influence, or have a considerable agency, in causing it? If so, could the defendants have removed it? and further, should they not, as prudent men, have done so, in order to guard against the chance of loss? Further, could the snag have been placed there by human agency?—not, whether it was placed there by human agency, but whether it could have been so placed there; if so, the jury must find for the plaintiffs."

The defendant excepted to this charge, and requested several others, which it is unnecessary to state.

The overruling of the motion to quash the attachment, the rulings of the court on the evidence, the charge given, and the refusal of the several charges asked, are the matters now assigned as error.

D. W. BAINE, and G. C. WHATLEY, for the appellant. 1. The attachment should have been dissolved. A foreign corporation is not liable to be sued, without express legislative authority.—16 Pick. 280; 16 Johns. 5. Prior to the act of February, 1854, there was no statute in this State, authorizing the issue of an attachment against such a corporation. To make the act of 1854 apply to the case, when the alleged injury occurred before its passage, would give a retroactive operation to the statute, and create a cause of action by legislative enactment.—16 Mass. 215; 10 Mass. 439; 8 Geo. 32; 1 Kelly, 176; 4 Geo. 216; Ladiga v. Rowland, 2 How. U. S. R. 587; Boyce v. Holmes, 2 Ala. 54; Philips v. Gray, 1 Ala. 226; Henry and Wife v. Thorpe, 14 Ala. 103; Jordan's Adm'r v. Hubbard and

Coosa River Steamboat Co. v. Barclay & Henderson.

Wife, 26 Ala. 438; Brown v. Wilcox, 14 Sm. & Mar. 127.

2. The freight bill, signed by the agent of the steamboat company, is not a bill of lading; nor is it a contract to convey the goods.—Angell on Carriers, 227.

3. The several charges given and refused raise the question of the liability of the company under the facts disclosed by the evidence; and this depends upon the meaning of the expression "act of God," which is always held to excuse a common carrier from responsibility. The "act of God," in this connection, is any inevitable accident, arising from natural causes, without the intervention of human agency.—Neal v. Saunderson, 2 Sm. & Mar. 572; Walpole v. Bridges, 5 Blackf. 222; Smyrl v. Niolin, 2 Bailey, 421; Cost v. McMechan, 6 Johns. 160. The snagging of a boat, on an obstruction recently lodged in the channel of a river, the existence of which was actually unknown, and could not have been ascertained or provided against, is an "act of God," for which the carrier is not responsible.—Smyrl v. Niolin, 2 Bailey, 423; Williams v. Grant, 1 Conn. 487; Fish v. Chapman, 2 Kelly, 357; Edwards on Bailments, 462; Story on Bailments, 332; Angell on Carriers, 181; 1 Rice, (S. C.) 107; 2 Speers, 208; 5 Rich. 25.

Jas. B. Martin, and Alex. White, contra.—1. The attachment is sustainable, either under the general law of the Code, or under the statute of 1854. The latter statute only gives an additional remedy for a cause of action already perfect, and for which there was a perfect remedy.

2. The bill of lading contains the contract between the parties, and is conclusive of their rights and liabilities. Parsons on Contracts, vol. 1, 647; Wayland v. Mosely, 5 Ala. 430; 7 Mass. 297; 1 Kinn. Law Comp. 164–68. Since the defendant violated this contract, in failing to forward the goods "on the steamer Georgia," it is liable for the loss which ensued, independent of all questions of accident, skill, or prudence.—Waring v. Morse, 7 Ala. 343; 3 Johnson's Cases, 178; 1 Sup. U. S. Digest, p. 245, § 113.

3. A common carrier is an insurer, and is held to a

rigid accountability.   In case of a loss under a general
contract, the law presumes that it did not result from the
act of God.—1 Parsons on Contracts, 634; Jones v.
Pitcher, 3 Stew. & P. 135; 21 Wendell, 201; 2 Kelly,
349.   The "act of God" is an event which is disconnected
from, and independent of all human agency.   A new snag
in a river, caused by a freshet, may, in one sense of the
word, be termed the "act of God"; but this was not, and
never could have been, the direct cause of the injury,
without the intervention of human agency in bringing
the boat in contact with it.—Smith's Leading Cases, vol. 1,
p. 232; 4 Yerger, 48; 5 Yerger, 72; 7 Yerger, 340;
12 Sm. & Mar. 599; 21 Wendell, 198.

STONE, J.—In Paschall v. Whitsett, 11 Ala. 478, this
court used the following expressions: "It may be con-
ceded, that a statute which merely gives a remedy at law,
where it could previously have been made available in
equity only, or *vice versa*, may, consistently with the con-
stitution, operate retrospectively, so as to embrace con-
tracts already made."—See, also, Iverson v. Shorter,
9 Ala. 715.

In Hoffman v. Hoffman, 26 Ala. 545, it was said,
"Whenever a statute is leveled against an abuse, or in
furtherance of an acknowledged principle of right and
justice, every reason exists for its most liberal application."
See, also, Wolcott v. Pond, 19 Conn. 597.

We think the following propositions are sustained both
by reason and authority; and that we may safely lay
them down as governing this case :

1. It is not within the power of the legislature to take
away vested rights.—Dash v. Van Kleck, 7 Johns. 477;
Baughn v. Nelson, 9 Gill, 299; Woodruff v. The State,
3 Pike, 285; Paschal v. Perez, 7 Texas, 348; Bruce v.
Schuyler, 4 Gilm. 221; Clarke v. McCreary, 12 Sm. &
Mar. 347; Houston v. Bogle, 10 Iredell, 496.

2. The legislature may alter, enlarge, modify, or confer
a remedy for existing legal rights, without infringing any
principle of the constitution.—The People v. Tibbets,
4 Cowen, 384; Baughn v. Nelson, *supra*; Read v. Frank-

fort Bank, 10 Shep. 318; Woods v. Buie, 5 How. (Miss.) 285; Fales v. Wadsworth, 10 Shep. 553; Woodfin v. Hooper, 4 Humph. 13; Fisher v. Lackey, 6 Blackf. 373; Knight v. Dorr, 19 Pick. 48; Commonwealth v. Phillips, 1 Pick. 28.

3. It is not within the power of legislation to create a cause of action out of an existing transaction, for which there was, at the time of its occurrence, no remedy.—Falconer v. Campbell, 2 McLean, 195; Austin v. Stephens, 11 Shep. 520; Medford v. Learned, 16 Mass. 215; Sutherland v. DeLeon, 1 Texas, 250.

4. Statutes which relate alone to the remedy, without creating, enlarging, or destroying the right, operate generally on existing causes of action, as well as those which afterwards accrue.—The People v. Tibbets, 4 Cowen, 384; Baughn v. Nelson, *supra*; U. S. Bank v. Longworth, 1 McLean, 35; Pratt v. Jones, 25 Vt. 303; Searcy v. Stubbs, 12 Geo. 437; Paschal v. Perez, *supra*; Hope v. Johnson, 2 Yerger, 125; Maltby v. Cooper, 1 Morris, 59; West v. Creditors, 1 La. Ann. Rep. 365; Newton v. Tibbets, 2 Eng. 150; Rockwell v. Hubbell, 2 Doug. 197.

The act of 1854, under which this proceeding was instituted, comes within the principles stated above, numbered 2 and 4; and the rule to show cause why the attachment should not be dissolved, was rightly discharged.—Acts of 1853–4, p. 29.

All the authorities agree, that a common carrier is excused from liability, if the loss or damage be traceable solely to the act of God. What are we to understand by the expression, "act of God"? Lord Mansfield said, "I consider it to mean something in opposition to the act of man; * * * such act as could not happen by the intervention of man, as storms, lightning, and tempests." Forward v. Pittard, 1 T. R. 27.

Messrs. Hare & Wallace, in their notes to Smith's Leading Cases, vol. 1, p. 180, favor the idea, that the legal phrase, "act of God," embraces only those results "that are occasioned exclusively by the *violence of nature*; by that kind of force of the elements, which human

ability could not have foreseen or prevented; such as lightning, tornadoes, sudden squalls of wind,. &c."

In support of this position, these annotators refer approvingly to McArthur & Hurlbert v. Sears, 21 Wendell, 190. The opinion of Cowen, J., in the case cited, is certainly an elaborate and careful presentation of the authorities on this question; but with all due deference, I think the case cited does not sustain them in their conclusions. The liability of the carrier, in that case, was based on the "admixture of human means" with the *operations of nature ;* and this, it was declared, *vitiated the defense.* Indeed, the loss was chargeable solely to the mistake of the master of the carrying vessel : mistaking a light on the steamboat North America, for one of the beacon lights of the harbor.

I think that Lord Mansfield, by employing the language, "such act as could not happen by the intervention of man," did not intend to hinge the carrier's liability on the physical ability of any man or set of men to rival the alleged *operations of nature.* His purpose was, to express in strong language the duty which the law casts on the carrier, of showing by satisfactory proof that the loss is not traceable, either in whole or in part, to human means, or to the negligence of himself or his agents; in other words, that it resulted from the unmixed "act of God." In my opinion, "the act of God," and the *operations of nature, unmixed with human agency or human negligence,* are synonomous. This view is sustained by the following modern authorities; and I think, it is the only one consonant with reason : Story on Bailments, §§ 511–16; Smyrl v. Niolin, 2 Bailey, 421; Williams v. Grant, 1 Conn. 487; Fish v. Chapman, 2 Kelly, 357; Edwards on Bailments, 462; Angell on Carriers, 181; Neal v. Saunderson, 2 Sm. & Marsh. 572; Cowles v. Finch, 12 Conn. 419.

In thus laying down my views of the law, it is not my purpose to shift the *onus,* or to relieve carriers from the strict diligence required of them in the older authors. To render the excuse valid, not only must the carrier trace the loss or injury immediately to the *operations of nature,* but he must also convince the jury that such loss

or injury resulted from *inevitable necessity*, "which no human prudence could foresee or prevent."—Williams v. Grant, *supra*.

I think it should have been left to the jury, to say whether, at the time of the disaster, the boat was in the usual and customary channel; whether the snag was deposited there without human agency; and whether it was so concealed, and so recently deposited, that no human skill and prudence could have detected and avoided it. On all these points, the law lays the *onus* on the carrier.

The paper relied on as a bill of lading, is but an account for freight, usually called a freight bill. This is a sufficient answer to that part of the argument, which assumes it to be a bill of lading.

We decline to consider the demurrers, as they present no question affecting the merits, which is not disposed of above.

Without making special application of these principles to the various charges given and refused, it is my opinion the judgment of the circuit court ought to be reversed. The chief-justice, however, differs with me. He holds, that the evidence in this case shows a case of a danger of the river, but utterly fails to trace the loss to the "act of God," within the legal definition of that term. In support of his opinion he cites Hare & Wallace's Notes, *supra;* McArthur & Hurlbert v. Sears, 21 Wendell, *supra;* Friend v. Woods, 6 Grattan, 189; Turney v. Wilson, 7 Yerger, 340.

Under the influence of the opinion of the chief-justice, the charge of the court was not technically correct. It did not, however, injure the defendant, because there was no evidence on which the jury could have excused the carrier. It was error without injury.

The result of this divided opinion between the only two members of the court who are competent to sit in this cause, is, that the judgment of the circuit court is affirmed.

WALKER, J., not sitting.