IN THE SUPREME COURT OF TEXAS
 
════════════
No. 06-0714
════════════
 
Barbara Robinson, Individually 
and as Representative of the
Estate of John Robinson, 
Deceased, Petitioner,
 
v.
 
Crown Cork & Seal Company, 
Inc., Individually and as Successor
to Mundet Cork Corporation, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fourteenth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued February 7, 
2008
 
 
            
Justice Wainwright, joined 
by Justice Johnson, 
dissenting.
           The 
Legislature enacted Chapter 149 of the Civil Practice and Remedies Code to 
protect businesses, which acquired other entities, from financial disaster based 
solely upon the acquired entities’ past, discontinued manufacture of asbestos 
products.  The statute limits the liability of the acquiring business, 
which had not engaged in the asbestos business, to the fair market value of the 
acquired entity at the time of the acquisition.  Through Chapter 149, the 
Legislature balances limitations on asbestos-related recoveries against 
protecting the assets and employees of businesses who did not cause the illness, 
while leaving intact the entirety of potential liability and damages proven 
against companies that were involved in the asbestos business and are, perhaps, 
more culpable.  The Court’s holding that the legislation is 
unconstitutional prevents the Legislature from addressing an injustice arising 
from a crisis that caused dozens of bankruptcies and the loss of thousands of 
jobs in this state and throughout the country due to asbestos-related 
litigation.  See, e.g., Jonathan Orszag, The Impact of Asbestos 
Liabilities on Workers in Bankrupt Firms, Remarks at the Asbestos Litigation 
Symposium at the South Texas College of Law in Houston, Tex. (Mar. 7, 2003), 
in 44 S. Tex. L. Rev. 
1077, 1078–80 (2003) (describing results of a study indicating that sixty-one 
companies entered into bankruptcy and that 52,000 to 60,000 people lost their 
jobs due to asbestos litigation).  
            
The Court’s new balancing test reaches the wrong result.  By holding that 
an unliquidated claim with “substantial basis in fact” is entitled to 
constitutional protection, it ignores an important principle.  ___ S.W.3d ___.  The constitutional retroactivity 
doctrine does not protect an asserted entitlement to property one does not own, 
and until a final judgment in a case, we do not know whether the claim will be 
vindicated or refuted.  The Court’s reasoning that the right to file a 
claim is protected by the retroactivity doctrine because, at least in part, the 
claim is well founded with a “substantial basis in fact” springing from a 
“mature tort” with “ more predictable” recovery, is a 
troubling proposition.  ___ S.W.3d ___.  It 
is unclear what that means, but it suggests that the 
constitutional retroactivity protection is dependent on the perceived strength 
of a claim.  The likelihood of success in litigation is dependent on a 
myriad of factors that make such predictions difficult at best.  We have 
held that an unliquidated personal injury claim is not a protected property 
interest, and the contingent recovery from one should not be either.
            
While Justice Medina, who writes 
separately, and I disagree on the 
result, we agree that the Court should not abandon vested rights jurisprudence 
in favor of a new and uncertain approach.  The analysis in the Court’s 
opinion is contrary to both the clear rule among the federal courts of appeals 
that have addressed the issue and the majority rule among our courts of 
appeals.  The Court could rely on traditional police power jurisprudence in 
which, even if the Robinsons had a vested right in their unliquidated cause of 
action, courts consider whether the Legislature’s action was justified by its 
constitutionally recognized police power to act in the interest of the health 
and welfare of Texas.  Indeed, the Court’s new balancing test for 
retroactivity analysis is similar to the police power balancing test I expound 
under existing law, but is newly incorporated into the retroactivity 
doctrine.  For all these reasons, I respectfully dissent.
 
I. BACKGROUND
            
John Robinson served in the Navy for twenty years, and during that time he was 
exposed to steam pipes and boiler doors coated with insulation containing 
asbestos.  Some of the insulation and other products were marked with a 
“big M,” the trademark used by Mundet Cork Corporation.  In August 2002, 
Robinson was diagnosed with mesothelioma.  He claims the disease occurred 
as a result of his exposure to asbestos in, among others, insulation products 
produced by Mundet.
            
Crown Cork itself has never been in the business of mining, manufacturing, 
installing, selling, distributing, removing, or otherwise making asbestos or any 
asbestos-containing product.  However, on November 7, 1963, Crown Cork’s 
predecessor entered into an agreement to purchase the majority of Mundet’s stock 
after the majority shareholder died and offered the shares for sale.  Crown 
Cork paid approximately $7 million for the stock, a majority interest in the 
company. 
            
Mundet ceased manufacturing insulation products prior to Crown Cork’s 
acquisition of Mundet, but continued to hold insulation products in stock until 
early 1964, when a third-party entity purchased the assets of Mundet’s 
insulation division, including its inventory, contracts, raw materials, and 
accounts receivables.  On January 4, 1966, Mundet statutorily merged with 
Crown Cork’s predecessor, and in 1989 Crown Cork was reincorporated in 
Pennsylvania.[1]
            
After he had been diagnosed with mesothelioma, Mr. Robinson and his wife filed 
suit in 2002 against Crown Cork and twenty other defendants for damages caused 
by Mr. Robinson’s exposure to asbestos-containing products.  The Robinsons 
sought to hold each defendant jointly and severally liable.  On November 
25, 2002, the Robinsons filed a motion for partial summary judgment to establish 
Crown Cork’s liability for actual damages as Mundet’s successor.  Crown 
Cork did not contest its successor liability for compensatory damages, and on 
July 16, 2003 the trial court granted the Robinsons’ motion, holding that Crown 
Cork “is liable and bears responsibility for the compensatory damages, if any, 
awarded to Plaintiffs that are attributable to the conduct, products, or torts 
of its predecessor Mundet Cork Corporation.”  
            
House Bill 4, a bill drafted to comprehensively address perceived crises in 
medical malpractice, asbestos, and other litigation issues in Texas, was 
introduced in the Texas House of Representatives on February 17, 2003, without 
any provision regarding successor asbestos liability.  Tex. H.B. 4, 78th 
Leg., R.S. (2003).  Its purpose was to operate as a “comprehensive civil 
justice reform bill intended to address and correct problems that currently 
impair the fairness and efficiency of our court system.”  House Comm. on 
Civil Practices, Bill Analysis, Tex. H.B. 4, 78th Leg., R.S. at 1 (2003). 
            
In late March 2003, more than 100 amendments were submitted to the Bill, 
including Article 17, the asbestos successor-liability article.  The 
article was debated on the floor of the House on March 25, 2003 and passed the 
House three days later.  Both the House and Senate held hearings on the 
bill as a whole.  In an April 30, 2003 meeting of the Senate State Affairs 
Committee, Senator Ratliff, the committee chair, introduced hearings on the 
Senate Substitute to House Bill 4.  He described Article 17 as follows:
Article 17, limitations in civil actions of liabilities relating to 
certain mergers or consolidations.  This, members, is the Crown Cork 
and Seal asbestos issue.  What we have put in this bill is what I 
understand to be an agreed arrangement between all of the parties in this—in 
this matter.
 
Hearings on 
the Proposed Senate Substitute for H.B. 4 Before the S. 
Comm. on State Affairs, 78th Leg., R.S. (Apr. 30, 2003) (Statement of Sen. Bill 
Ratliff, Chairman, S. Comm. on State Affairs).  The act passed the Senate 
on May 16, 2003; the House accepted the Conference Committee compromise bill on 
June 1, 2003; both adopted corrections on June 2, 2003; and the bill was signed 
into law by the Governor on June 11, 2003.  Act of June 2, 2003, 78th Leg., 
R.S., ch. 204, 2003 Tex. Gen. Laws 847, 899 (codified at Tex. Civ. Prac. & Rem. 
Code §§ 
149.001–.006).  With a two-thirds vote in both 
chambers, the bill took effect immediately and was made retroactive to all cases 
“pending on that effective date and in which the trial, or any new trial or 
retrial following motion, appeal, or otherwise, begins on or after that 
effective date.”[2]  Id. § 17.02(2), 2003 Tex. 
Gen. Laws at 895; see also Tex. 
Const. art. III, § 39 (“No law passed 
by the Legislature, except the general appropriation act, shall take effect or 
go into force until ninety days after the adjournment of the session at which it 
was enacted, unless the Legislature shall, by a vote of two-thirds of all the 
members elected to each House, otherwise direct; said vote to be taken by yeas 
and nays, and entered upon the journals.”).
            
The act limits the “cumulative successor asbestos-related liabilities” “incurred 
by a corporation as a result of or in connection with a merger or consolidation . . . with or into another 
corporation or that are related in any way to asbestos claims based on the 
exercise of control or the ownership of stock of the corporation before the 
merger or consolidation that occurred” prior to May 13, 1968.  Tex. Civ. Prac. & Rem. 
Code §§ 149.001–.003.[3]  The asbestos liabilities of 
successor corporations “are limited to the fair market value of the total gross 
assets of the transferor determined as of the time of the merger or 
consolidation,” id. § 149.003(a), and adjusted for inflation at a simple 
interest rate of the prime rate plus one percent, id. § 149.005(a).  
An “asbestos claim” is “any claim, wherever or whenever made, for damages, 
losses, indemnification, contribution, or other relief arising out of, based on, 
or in any way related to asbestos, including” property damage caused by 
asbestos, the health effects of asbestos exposure, or any claim made by or on 
behalf of any person exposed to asbestos.  Id. § 
149.001(1).  The Legislature clearly intended to limit recoveries 
only against so-called “innocent” successor companies.
            
According to Crown Cork’s experts, by May 2003, Crown Cork had paid or agreed to 
pay asbestos related claims, not covered by insurance, totaling more than seven 
times the present value of Mundet according to the statutory formula.  On 
July 3, 2003, Crown Cork filed a Motion for Summary Judgment raising the 
affirmative defense of Chapter 149, introducing evidence of the value of Mundet 
and total asbestos-related payments made by Crown Cork to date.  The 
Robinsons asserted that the statute was a “special law” in violation of article 
III, section 56 of the Texas Constitution, that it deprived the Robinsons of a 
vested property right in violation of article I, section 16 of the Texas 
Constitution, that the statute was an unconstitutional taking, violating article 
I, section 17 of the Texas Constitution and the Fifth and Fourteenth Amendments 
to the United States Constitution, that it constituted a deprivation of 
substantive due process rights under the Texas and United States Constitutions, 
that it deprived John Robinson of a contractual right, contrary to article I, 
section 16 of the Texas Constitution, and deprived John Robinson of his common 
law causes of action in violation of the Open Courts guarantee in article I, 
section 13 of the Texas Constitution.  The Robinsons raise only the 
retroactivity and special law challenges before this Court.  Implicitly 
finding that Crown Cork had established that the statute applied to it as a 
matter of law, and that Crown Cork had already paid liabilities in excess of 
Mundet’s adjusted value, the trial court granted Crown Cork’s motion for summary 
judgment on October 2, 2003.  It issued an amended order nineteen days 
later, dismissing claims against Crown Cork brought by the Robinsons.[4]  The Robinsons nonsuited their 
remaining claims against Crown Cork and then appealed the summary judgment.[5]  The court of appeals 
affirmed.  Characterizing the jurisprudence on vested rights as 
“inconsistent and difficult to use as a guide,” the court instead balanced the 
Legislature’s police power against the private rights impacted by the statute, 
and held that the statute was constitutional.  251 S.W.3d 
520, 532–35 (Tex. App.—Houston [14th Dist.] 2006, pet. granted).  
One justice dissented, arguing that the court should have applied a vested 
rights analysis and concluded that the statute violated article I, section 
16.  Id. at 551–52 (Frost, J., 
dissenting).
II. ANALYSIS
            
In this Court, the Robinsons raise only two issues, and both are grounded 
exclusively in Texas law.  They argue that Chapter 149 of the Texas Civil 
Practice and Remedies Code is an unconstitutional “special law” and that it is 
unconstitutionally retroactive when applied to the Robinsons’ claims to 
effectively bar recovery.[6]  As the party challenging the 
constitutionality of the statute, the Robinsons must overcome the presumptions 
that “the Legislature intended for the law to comply with the United States and 
Texas Constitutions, to achieve a just and reasonable result, and to advance a 
public rather than a private interest.”  Tex. 
Mun. League Intergovernmental Risk Pool v. Tex. Workers’ Comp. 
Comm’n, 74 S.W.3d 377, 381 (Tex. 2002) (citing Tex. Gov’t Code § 311.021; Spence v. Fenchler, 180 S.W. 597, 
605 (Tex. 1915)).  The Robinsons also bear the burden 
of showing that the law is contrary to a provision of the state 
constitution.  See, e.g., Walker v. 
Guiterrez, 111 S.W.3d 56, 66 (Tex. 2003).  The Robinsons’ 
retroactivity claim is an as-applied challenge, which means that they must 
demonstrate that the statute is unconstitutional as it operates in practice 
against them.  Tex Mun. League, 74 
S.W.3d at 381 (citing Tex. Workers’ Comp. Comm’n v. Garcia, 893 S.W.2d 
504, 518 n.16 (Tex. 1995)).  Their special law 
challenge is a facial challenge, which means that the Robinsons must demonstrate 
there is no conceivable set of facts that could exist under which the statute 
would be constitutional.  Garcia, 893 S.W.2d at 
520.
            
In this case the Court determines that the law is unconstitutionally retroactive 
and thus does not reach the special law challenge.  However, for the 
reasons that follow, I would hold that the law survives both challenges, but for 
reasons different from those articulated by the court of appeals.
A.  Retroactive Law
            
Article I, section 16 of the Texas Constitution, part of the Texas Bill of 
Rights, declares that “[n]o bill of attainder, ex post facto law, retroactive 
law, or any law impairing the obligation of contracts, shall be made.”  
Tex. Const. art. I, § 
16.  A retroactive law “takes away or impairs vested rights acquired 
under existing laws . . . .”  
Paschal v. Perez, 7 Tex. 348, 365 (1851). 
 A retroactive law means a law applying to things that are 
past.  DeCordova v. City of Galveston, 4 Tex. 470, 
475 (1849).
            
Of course, not every law that affects relationships among parties based upon 
events occurring in the past is automatically unconstitutional, just as not 
every law that may affect a person’s right to speak, that may affect a 
contractual obligation, or that may allow a search of a person’s dwelling 
without a warrant, is unconstitutional.  See Subaru of Am. v. David McDavid Nissan, Inc., 84 
S.W.3d 212, 219 (Tex. 2002).  This Court has articulated 
three doctrines that further define the scope of the retroactivity 
prohibition.  First, a law is not unconstitutionally retroactive unless it 
impairs a person’s “vested rights.”  E.g., 
id. at 219.  Second, a law is not 
unconstitutionally retroactive if it only modifies or reduces the person’s 
remedy.  E.g., City of Tyler v. Likes, 962 S.W.2d 489, 502 
(Tex. 1997);  Holder v. Wood, 
714 S.W.2d 318, 319 (Tex. 1986).  And finally, even if the law affects a 
person’s vested rights, and not a remedy, a law may not violate the 
retroactivity prohibition if the government’s interest in protecting society, 
based upon its police power, outweighs the individual’s interest in his or her 
particular right.  E.g., Barshop v. Medina 
Cnty. Underground Water Conservation Dist., 925 S.W.2d 618, 633–34 (Tex. 
1996).  The first two tests are definitional—this Court 
has determined that a retroactive law does not implicate article I, section 16 
of the Constitution unless the law both affects a vested right and impairs an 
actual right, not merely a remedy or a procedure.  The third test may 
operate as an exception to the rule.  Although related, the review of each 
doctrine is separate.  E.g., In re A.V. & J.V., 113 
S.W.3d 355, 361 (Tex. 2003) (describing “exceptions” to retroactivity); David 
McDavid Nissan, 84 S.W.3d at 219 (analyzing the procedural/remedial test as 
part of the vested rights exception because “procedural and remedial statutes 
typically do not affect a vested right”).  Although the Court has not had 
occasion recently to address the specific meaning of article I, section 16’s 
prohibition of retroactive laws, our precedents provide a useful roadmap.
1.  Vested Rights
            
Vested rights derive from “[c]onsiderations of fair notice, reasonable reliance, 
and settled expectations.”  Owens-Corning v. 
Carter, 997 S.W.2d 560, 572–73 (Tex. 1999).  “A retroactive 
statute only violates our Constitution if, when applied, it takes away or 
impairs vested rights acquired under existing law.”  David McDavid 
Nissan, 84 S.W.3d at 219 (citing Ex parte Abell, 613 S.W.2d 255, 260 
(Tex. 1981)); McCain v. Yost, 284 S.W.2d 898, 900 (Tex. 1955). 
            
We explained “vested rights” in Ex parte Abell:
[A] 
right, in a legal sense, exists, when, in consequence of the existence of given 
facts, the law declares that one person is entitled to enforce against another a 
given claim, or to resist the enforcement of a claim urged by another.  
Facts may exist out of which, in the course of time or under given 
circumstances, a right would become fixed or vested by operation of existing 
law, but until the state of facts which the law declares shall give a right 
comes into existence there cannot be in law a right; and for this reason it has 
been constantly held that, until the right becomes fixed or vested, it is 
lawful for the lawmaking power to declare that the given state of facts shall 
not fix it, and such laws have been constantly held not to be retroactive 
in the sense in which that term is used.
 
613 S.W.2d at 
261 (quoting Mellinger v. City of Houston, 3 S.W. 249, 253 (Tex. 1887)) 
(emphasis added).  “A right cannot be considered a vested right unless it 
is something more than “a mere expectation as may be based upon an 
anticipated continuance of the present general laws; it must have become a 
title, legal or equitable . . . .” 
Id. (citation omitted) (emphasis added).  This Court has clearly 
articulated that “no one has a vested right in the continuance of present laws 
in relation to a particular subject . . . .  There cannot be a 
vested right, or a property right, in a mere rule of law.”  Middleton v. Tex. Power & Light Co., 185 S.W. 556, 560 
(Tex. 1916).
            
The court of appeals called the vested rights analysis “inconsistent and 
difficult to use as a guide.”  251 S.W.3d at 
526.  Other courts of appeals have called the vested rights analysis 
“amorphous.”  Sims v. Adoption Alliance, 922 
S.W.2d 213, 216 (Tex. App.—San Antonio 1996, writ denied); Ex parte 
Kubas, 83 S.W.3d 366, 369 (Tex. App.—Corpus Christi 2002, pet. 
ref’d).  Courts from other states and commentators have also 
criticized vested rights analyses, preferring an analysis requiring a balancing 
of the nature and strength of the public interest served by the statute, the 
extent to which the statute modifies or abrogates the pre-enactment right, and 
the nature of the right the statute alters.  See, e.g., Owen 
Lumber Co. v. Chartrand, 73 P.3d 753, 755–56 (Kan. 2003); Peterson v. 
City of Minneapolis, 173 N.W.2d 353, 356–57 (Minn. 1969); see also 
Charles B. Hochman, The Supreme Court and the Constitutionality of 
Retroactive Legislation, 73 Harv. L. 
Rev. 692, 697 (1960).  And the Court’s opinion, in rejecting a 
“bright-line test for unconstitutional activity,” and in recognizing that the 
Texas Constitution “does not insulate every vested right from impairment,” seems 
to abandon the vested rights analysis altogether, or, at a minimum, detaches the 
concept of vested rights from its traditional significance in a retroactivity 
analysis.  ___ S.W.3d  ___. However, the 
doctrine’s difficulty is not a justification to abandon it wholesale.  For, 
at the core of the vested rights doctrine lies an 
extremely important principle—the constitutional retroactivity doctrine does not 
protect an asserted entitlement to property one does not own, and until a final 
judgment in a case, we do not know whether the lawsuit will prove or refute a 
claim to recover.
            
Applying our century-old jurisprudence, I would hold that an accrued, but 
unliquidated cause of action is not a vested right because: (1) the framers of 
the Texas Constitution would not have considered an unliquidated cause of action 
to be a vested property right entitled to protection under the Retroactivity 
Clause; (2) a lawsuit is not a right to recover anything but a contingent and 
unliquidated pursuit of a claimed injury that may or may not be successful; and 
(3) until and unless a final judgment is rendered in favor of the claimant, 
there is no right to recover damages on the claim against another.  See Mellinger, 3 S.W. at 252; Graham v. Franco, 488 
S.W.2d 390, 393 (Tex. 1972); Ex parte Abell, 613 S.W.2d at 
260.
            
In interpreting the Texas Constitution, our duty is “to ascertain and give 
effect to the plain intent and language of the framers of [the constitution] and 
of the people who adopted it.”  Wilson v. Galveston 
Cnty. Cent. Appraisal Dist., 713 S.W.2d 98, 
101 (Tex. 1986) (quoting Gragg v. Cayuga Indep. Sch. 
Dist., 539 S.W.2d 861, 866 (Tex. 
1976)).  We look 
to such 
things as the language of the constitutional provision itself, its purpose, the 
historical context in which it was written, the intentions of the framers [and 
ratifiers], the application in prior judicial decisions, the relation of the 
provision to [other parts of the constitution and] the law as a whole, the 
understanding of other branches of government, the law in other jurisdictions, 
state and federal, constitutional and legal theory, and fundamental values 
including justice and social policy. 
 
Davenport 
v. Garcia, 834 S.W.2d 4, 30 (Tex. 1992) (Hecht, J., concurring) (citations 
omitted).  
            
Examining the state of “vested rights” and what constitutes a vested property 
right at the time of the framing of the 1876 Constitution provides important 
insight into what the Framers considered protected by the Retroactivity 
Clause.  Prior to and at the time of the adoption of the Texas Constitution 
in 1876, it was well established that the doctrine of vested rights created an 
exception to the prohibition on retroactive legislation.  See, 
e.g., DeCordova, 4 Tex. at 475; Paschal, 7 Tex. at 365 (“Mr. 
Justice Story defines a retrospective law to be, one which takes away or impairs 
vested rights acquired under existing law, or creates a new obligation, or 
imposes a new duty, or attaches a new disability in relation to transactions 
already past.” (citing Soc’y for the Propagation of the Gospel v. 
Wheeler, 2 Gall. 105, 138, 22 F. Cas. 756, 767 (No. 13,156) (C.C.D.N.H. 
1814))).[7]  A vested right is now, and was 
then, considered some form of “property right.”  Middleton, 185 S.W. 
at 560.  However, at the time of the framing of the cCnstitution of 1876, 
an accrued, but unliquidated, cause of action for personal injury, was not “property” in any sense.  See G. H. 
& S. A. R.R. v. Freeman, 57 Tex. 156 (1882); Stewart v. H. & T. 
C. Ry. Co., 62 Tex. 246 (1884).  Common law tort causes of 
action for personal injury could not be assigned and did not survive the death 
of the victim.  As described by Chief Justice Greenhill:
By the 
clear weight of common law authority, a cause of action for personal injury 
is not property in any sense, nor for any purpose till it has been reduced to 
judgment; and the judgment, as property, takes its character as separate or 
common from the right violated in committing the wrong—the personal injury.
 
Graham, 
488 S.W.2d at 393 (emphasis added) (quotation omitted); see also State Farm 
Fire & Cas. Co. v. Gandy, 925 S.W.2d 696, 
706–07 (Tex. 1996) (discussing the role at common law regarding the 
assignability and survivability of personal injury tort causes of action).  
Legislation was required to amend both of those common law rules.  
E.g., Act of May 4, 1895, 24th Leg., R.S., ch. 89, § 1, 1895 Tex. Gen. Laws 
143 (current version at Tex. Civ. Prac. 
& Rem.Code § 71.021) (allowing survival of personal injury 
claims); Tex Prop. Code § 
12.014(a) (allowing “an interest in a cause of action on which suit has been 
filed” to be “sold, regardless of whether the 
. . . cause of action is assignable in law or equity”); 
Gandy, 925 S.W.2d at 707 (noting that personal injury claims only became 
assignable after they could survive the owner’s death).  
            
As in other circumstances, property is treated differently.  In 1876, 
choses in action for injury to property were considered property, and they were 
alienable, assignable, and devisable.  
[W]hen the 
injury affects the estate rather than the person, when the action is brought for 
damage to the estate and not for injury to the person . . . the right of action 
could be bought and sold.  Such right of action, upon the death, bankruptcy 
or insolvency of the party injured, passes to the executor or assignee as a part 
of his assets . . . .
 
Graham, 
488 S.W.2d at 393 (quoting Freeman, 57 Tex. at 158); see also 
Gandy, 925 S.W.2d at 706 (noting that “[t]he pressures against the rule 
of inalienability were commercial and thus affected only debts and other 
contract rights that were not personal to the owner and could survive to his 
estate upon his death”).  The common law in Texas did not consider tort 
causes of action for personal injury to be “property,” and “vested rights”— 
a concept recognized in common law at the time of the framing 
of the 1876 Constitution—are a species of property.  Therefore, 
under the Texas Constitution, ratified in 1876, an accrued, but unliquidated 
personal injury cause of action was not considered to be a “vested right” for 
purposes of the Retroactivity Clause.  Gandy, 925 
S.W.2d at 706.  This reasoning applies with special force to the 
Robinsons’ as-applied challenge, because at common law Mr. Robinson’s claims 
would not have survived his death.  His claims exist today only by virtue 
of statutes.  The framers of the Texas Constitution would have not believed 
that there would be a settled expectation in allowing Mrs. Robinson to continue 
to prosecute these uncertain claims, either as Mr. Robinsons’s personal 
representative or derivatively through a statutorily created wrongful death 
action.
            
The Court recognizes this historical disconnect, yet dismisses it in a single 
sentence, stating simply that “[t]he rights protected by the constitutional 
prohibition against retroactive laws are no more limited to those recognized at 
the time the prohibition was adopted than are the rights protected by due course 
of law.”  ___ S.W.3d ___.  A court should be 
cautious in providing new protections for rights that were not part of the 
sphere of rights contemplated by the democratic institutions that enacted the 
constitution.  See McDonald v. City of Chicago, ___ U.S. ___, 130 S. 
Ct. 3020, 3051–53 (2010) (Scalia, J., concurring) (criticizing the dissent’s 
conceptual framework to “‘do justice to [the Due Process Clause’s] urgent call 
and its open texture’ by exercising the ‘interpretive discretion the latter 
embodies” and to hold that the Clause encompasses “new freedoms the Framers were 
too narrow-minded to imagine” (quoting Id., ___ U.S. ___, 130 S. 
Ct. at 3099–100 (Stevens, J., dissenting))). 
            
The right to file a cause of action is not an entitlement to enforce the alleged 
claim, but a “mere expectation” subject to numerous contingencies.  Ex parte Abell, 613 S.W.2d at 261–62; Mellinger, 3 
S.W. at 252–53.  A plaintiff’s ultimate recovery is 
contingent upon more than just success at trial.  For example, it is 
contingent upon finding—and serving with process— the right defendant, who may 
be an inaccessible foreign defendant, or, as in this case, may be a corporation 
long since out of business.  See, e.g., Tex. R. Civ. P. 103–109a (discussing 
methods of service); GFTA Trendanalysen B.G.A. Herrdum GMBH & Co., K.G. 
v. Varme, 991 S.W.2d 785, 785 (Tex. 1999) (per curiam) (holding 
special appearance by foreign corporation did not waive challenge to 
jurisdiction).  A plaintiff’s recovery may be contingent upon following 
particular pretrial procedures, such as the filing of an expert report or 
providing discovery.  See Tex. Civ. Prac. & Rem. 
Code § 74.351 (requiring the 
service of an expert report by the plaintiff in a health care liability claim 
and demanding dismissal of the claim if the report is not timely served); 
Cire v. Cummings, 134 S.W.3d 835, 841–42 (Tex. 2004) (holding that “death 
penalty” sanctions of dismissing plaintiff’s claim was warranted because of 
plaintiff’s failure to produce audiotapes that would have proved or disproved 
plaintiff’s legal malpractice claims).  Any informed client knows that 
winning a lawsuit, even a seemingly “open and shut” case, is never certain, 
particularly when multiple defendants and multiple products may have caused the 
same injury, and no reasonable person has a “settled expectation” of achieving 
monetary recovery once she discovers a harm inflicted upon her.
            
Rather, I would hold, consistent with the jurisprudence of the United States 
Supreme Court[8] a majority of the federal courts of 
appeals,[9] a number of other states,[10] and a majority of the courts of appeals 
to address the issue in this state,[11] that a cause of action becomes a “vested 
right” for the constitutional retroactivity analysis when it has reached a final 
determination—that is, where it has been reduced to an enforceable judgment in 
the plaintiff’s favor.[12]  As aptly put in an opinion of the 
Court of Appeals for the First District:
A “vested 
right” implies an immediate right or entitlement—it is not an expectation or a 
contingency. . . .  Engrained in the concept of vested 
rights is the idea of certainty. . . .  The filing of a 
lawsuit in order to obtain relief or pursue a remedy is generally held not to 
create or destroy vested rights; the triggering event for the vesting of a right 
is the resolution of the controversy and the final determination—not the filing 
of the suit.
 
Houston Indep. Sch. Dist. v. 
Houston Chronicle Publ’g Co., 798 S.W.2d 580, 
589 (Tex. App.—Houston [1st Dist.] 1990, writ denied).
            
This rule is most consistent with the understanding of vested property rights at 
the time of the ratification of the 1876 Constitution.  It is consistent 
with our subsequent interpretation of the words of the Retroactivity 
Clause.[13]  It is 
consistent with our case law and the great weight of court of appeals 
opinions.  And it is more predictable and avoids confusion and ambiguity 
when the Legislature attempts to constitutionally craft a law affecting past 
conduct.
            
This Court’s first significant discussion of retroactivity occurs in 
Mellinger v. City of Houston, 3 S.W. 249 (Tex. 1887).  The City of 
Houston sued to recover taxes on property that would otherwise have been barred 
by a subsequently repealed statute of limitations.  The Court ruled that 
the statute was not to be applied retroactively and thus did not 
specifically decide whether Mellinger had a vested right that would be 
violated by retroactive application of the law.  Id. at 
251–52.  It then stated that “an action barred by the 
statute of limitations was forever barred” and explained that a law may be 
unconstitutionally retroactive “if a statute of limitations applied to existing 
causes barred all remedy, or did not afford a reasonable period for their 
prosecution; or if an attempt were made by law, either by implication or 
expressly, to revive causes of action already barred . . . .”  Id. at 253–55.  Mellinger did not hold 
that an unaccrued cause of action was a vested right subject to protection, but 
it did indicate that a shortening of the statute of limitations would require a 
grace period to allow those who had not filed their cause of action to do so 
before the new limitations period would come into effect.  Id.
            
Subsequent cases from this Court recognize that the Legislature cannot resurrect 
causes of action that have already been extinguished by retroactively 
lengthening the statute of limitations.  E.g., Baker Hughes, Inc. 
v. Keco R. & D., Inc., 12 S.W.3d 1, 4 & n.12 (Tex. 1999); Wilson 
v. Work, 62 S.W.2d 490, 490–91 (Tex. 1933) (per curiam).  This rule 
makes sense because “[t]o permit barred claims to be revived years later would 
undermine society’s interest in repose, which is one of the principal 
justifications for statutes of limitations.”  Baker Hughes, 12 S.W.3d at 4.  In other words, when the statute 
extinguished a cause of action, a defendant received a vested right of repose 
barring the extinguished claim. 
            
In City of Tyler v. Likes, 962 S.W.2d 489 (Tex. 1997), a case upon which 
the Robinsons principally rely, this Court held that a modification of the Tort 
Claims Act to provide the city with sovereign immunity from the plaintiff’s 
common law tort claims was not constitutionally retroactive.  It recognized 
that the statute “affect[ed] a remedy” for the plaintiff, which usually does not 
implicate the Retroactivity Clause unless the “remedy is entirely taken 
away.”  Id. at 502 (citation 
omitted).  We noted that “[t]he Legislature can affect a remedy by 
providing a shorter limitations period for an accrued cause of action without 
violating the retroactivity provision of the Constitution if it affords a 
reasonable time or fair opportunity to preserve a claimant’s rights under the 
former law, or if the amendment does not bar all remedy.”  Id. 
(citing Tex. Water Rights Comm’n v. Wright, 464 S.W.2d 642, 649 (Tex. 
1971); Mellinger, 3 S.W. at 254–55).  Because the statute became 
effective seventeen months after her action accrued, the Court held that the 
plaintiff had a reasonable time to preserve her rights, and thus the statute was 
not unconstitutional as applied.  Id.  Likes emphasizes 
(as discussed further below) that where the legislation affects the plaintiff’s 
remedy without entirely taking it away, the legislation is not 
unconstitutionally retroactive.  Id.
            
Finally, this Court has specifically held that the Mellinger 
retroactivity exception, requiring that a party receive reasonable time to 
preserve its rights, which was relied on in 
Likes, has an exception itself.  In Owens Corning v. Carter, 
997 S.W.2d 560 (Tex. 1999), the Court upheld a retroactive application of an 
amended borrowing statute against a constitutional challenge.  At the time 
the lawsuit underlying the case was filed, Texas’s borrowing statute provided 
that a non-Texan who was injured in a foreign state could bring an action in 
Texas, even if the limitations period in the plaintiff’s home state had run, so 
long as the action was begun within the time provided by Texas law. 
 Id. at 565; cf. Igal v. Brightstar Info. Tech. Grp., Inc., 
250 S.W.3d 78, 90–91 (Tex. 2008) (holding that res judicata bars relitigation of 
administratively determined facts and distinguishing a rule where “a claimant 
whose action is precluded by limitations in one state court may still be able to 
pursue the same action in a different state with a longer limitations period”). 
 In early 1997, while the plaintiffs’ lawsuits were pending, the 
Legislature amended the statute to require, among other things, that the action 
is begun in Texas within the time provided both by Texas law and the law of the 
foreign state in which the wrongful act, neglect, or default took place. 
 Carter, 997 S.W.2d. at 572 (citing Tex. Civ. Prac. & Rem. Code § 
71.031(a)(3)).  The plaintiffs challenged the law 
as unconstitutionally retroactive, and we rejected that challenge.  First, 
we recognized that the plaintiffs did not have any settled expectations in the 
continuance of the current law—the limitations period.  Second, we noted 
that “requiring a grace period for otherwise time-barred claims would defeat the 
very purpose of the borrowing statute: a plaintiff should not be able to gain 
greater rights than he would have in the state where the cause of action arose 
and where he lives simply by bringing suit in Texas.”  Id. at 573.  In other words, even if the statute 
of limitations “grace period” rule articulated in Mellinger were to 
apply, because Alabama plaintiffs applying Alabama law had no expectation in the 
continuation of the borrowing statute, “such concerns play a minimal role and do 
not justify the application of a grace period.”  Id. (citing In 
re TMI, 89 F.3d 1106, 1116 (3d Cir. 1996)).
            
This Court has recognized that contingencies, future expectations, and mere 
rules of law do not constitute vested rights.  We have upheld retroactivity 
challenges only when it interferes with a final judgment, involved the vested 
parent-child relationship, or when the statute attempts to revive a cause of 
action previously barred by the statute of limitations.  E.g., Milam County, 54 Tex. at 168; In re A.V., 
113 S.W.3d 355, 361 (Tex. 2003); Baker Hughes, 12 S.W.3d at 
5.  Otherwise, we have held on many occasions that laws, even those 
that explicitly apply retroactively, do not violate the Retroactivity Clause in 
article 1, section 16.  See, e.g., David McDavid Nissan, 84 
S.W.3d at 219–20; Carter, 997 S.W.2d at 573; Likes, 962 S.W.2d at 
502; Barshop, 925 S.W.2d at 634; Ex parte Abell, 613 S.W.2d at 
262; Exxon Corp. v. Brecheen, 526 S.W.2d 519, 525 (Tex. 1975); 
McCain, 284 S.W.2d at 900; City of Dallas v. Trammell, 101 S.W.2d 
1009, 1012–13 (Tex. 1937). 
            
The Robinsons’ expectation that they could recover damages against Crown Cork as 
one of the numerous defendants in their lawsuit was low at the time Mr. 
Robinson’s common law causes action accrued.  Numerous contingencies 
surrounded their litigation, not the least of which were the identity of the 
potential tortfeasors and proving causation against Mundet from among nine other 
defendants.[14]  If they knew that Mundet was one 
of the parties responsible for producing asbestos that Mr. Robinson was exposed 
to, it is unlikely that they knew that Mundet had been bought by Crown Cork 
decades prior.  This is not a situation where the obligations of two 
parties are identified by contract, where the government seeks to interfere with 
the parent-child relationship, or a party seeks to resurrect a claim long 
extinguished by a statute of limitations.  Our case law is consistently 
hesitant to void statutes outside those categories as retroactive, and this is 
not an area into which our jurisprudence should expand.[15]
            
Finally, a “brighter-line” view provides more certainty and predictability and 
avoids confusion and ambiguity.  Causes of action accrue when claimants are 
on notice of their injury and have the opportunity to seek a judicial remedy, 
when the injury occurs, or at the death of a promisor.  Quigley v. Bennett, 227 S.W.3d 51, 58 (Tex. 2007); 
Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 221 
(Tex. 2003).  Certainly, these accruals almost always occur prior to 
the filing of a lawsuit (otherwise the claim would not be ripe).  
Therefore, accepting the Court’s position that a right to file a lawsuit is a 
vested right would, in effect, preclude the Legislature from taking any action 
to modify or restrict a cause of action for some lawsuits that had not even been 
filed yet.  It would further lead to unnecessary uncertainty and 
confusion.
            
The Robinsons did not have a vested right in their accrued causes of action when 
Mr. Robinson was diagnosed with mesothelioma.  At most, they had contingent 
belief that they might be able to recover against Crown Cork or the other 
defendants.  At the time Mr. Robinson’s cause of action accrued, the 
Robinsons had not taken any action in reliance on the law at the time, and they 
had no entitlement to the law as it existed.  Even after they filed their 
action and received a partial summary judgment that Crown Cork was liable as a 
successor corporation, they had an unliquidated interest in a personal injury 
tort claim that was not recognized as a property right—vested or otherwise—at 
common law.  The expectation further deteriorated when Mr. Robinson passed 
away, and Mrs. Robinson asserted new statutory survival and wrongful death 
claims.  I would hold that, when the Legislature limited recovery for 
asbestos claims only against innocent successor corporations that had caused no 
injury to claimants, the Legislature did not deprive the Robinsons of a vested 
right of action against Crown Cork, and thus Chapter 149 is not 
unconstitutionally retroactive as applied to the Robinsons.  The Robinsons 
are not foreclosed, however, from going forward with their claims against other 
entities, consistent with the Act’s limitations on recovery.
2.  Police Power Balancing
            
The Robinsons argue that there is no room for a balancing of interests in the 
retroactivity analysis.  They contend that if a right is vested, it cannot 
be affected by retroactive legislation.[16]  Regardless of whether the “vested 
rights” threshold exists, a balancing of interests and expectations is an 
integral part of retroactivity analysis in Texas jurisprudence, the 
jurisprudence of other states, and commentators and scholars in this area.  
Although the Court also balances interests, much in the same way I believe our 
jurisprudence demands that we balance interests pursuant to the state’s police 
power, the Court’s analysis overlooks a few critical 
points.
            
Courts carefully recognized that a retroactive law affecting vested rights may 
nonetheless be constitutional if the overriding public purpose of the act and 
the Legislature’s legitimate exercise of its police power outweigh the interests 
or expectations of the affected party.  E.g., Barshop, 925 S.W.2d at 633–34.  As Justice Oliver Wendell Holmes, 
Jr. recognized in the context of a takings suit based on a statute retroactively 
preventing a mining company exercising its contractual rights to mine coal under 
a house:
Government 
hardly could go on if to some extent values incident to property could not be 
diminished without paying for every such change in the general law.  As 
long recognized, some values are enjoyed under an implied limitation and must 
yield to the police power.  But obviously the implied limitation must have 
its limits, or the contract and due process clauses are gone. 
 
Pa. Coal 
Co. v. Mahon, 260 U.S. 393, 413 (1920); see also In re Marriage of 
Bouquet, 546 P.2d 1371, 1376 (Cal. 1976) (noting that vested rights may be 
impaired when “reasonably necessary to the protection of the health, safety, 
morals, and general well being of the people”); Phillips v. Curiale, 608 
A.2d 895, 902 (N.J. 1992); Hochman, 73 Harv. L. Rev. at 697 (advocating the 
abrogation of the “vested rights” concept and instead analyzing U.S. Supreme 
Court jurisprudence on retroactivity balancing the nature of the public interest 
served, the extent to which the statute modifies the asserted pre-enactment 
right, and the nature of the right which the statute alters). 
            
In considering the balancing test to be applied this case, the court of appeals 
balanced the proper exercise of the police power (weighing presumably not only 
the validity of the exercise, but the importance as well) against the 
“detrimental impact on plaintiffs such as the Robinsons,” noting that the 
statute was narrowly tailored to protect the most innocent corporations but 
still “leaving the pool of potential [asbestos] defendants as large as possible . . . .” 251 S.W.3d 
at 532–33.  The Court, on the other hand, balances:  (1) the 
nature and strength of the public interest served by the statute as evidenced by 
the Legislature’s factual findings; (2) the nature of the prior right impaired 
by the statute; and (3) the extent of the impairment.  ___ S.W.3d ___.  Using this test, the Court determines 
that Chapter 149 is unconstitutionally retroactive as applied to the 
Robinsons.
            
The Court asserts that what “constitutes an impairment of vested rights is too 
much in the eye of the beholder to serve as a test for unconstitutional 
retroactivity. . . [and there is] a deep division over 
whether a retroactive restriction on a cause of action impairs vested rights. 
” __ S.W.3d ___.   So the Court vanquishes the vested rights 
jurisprudence because it is too hard to decide and it believes some cases 
applying it in the past were inconsistent.  What areas of jurisprudence 
that span two centuries are not subject to the same criticisms?  No one who 
has raised children doubts the statement that bathing a baby is challenging and 
risky and can be a tough chore, but it must be done.  The Court throws out 
the baby it once embraced along with the bath water.  It will come as no 
surprise that the new balancing test the Court establishes for evaluating 
retroactive legislation will be fraught with at least as many similar 
challenges, but have no precedents for guidance.  The balancing test in 
Texas retroactivity jurisprudence is, candidly, a new baby in new bath 
water.  Certainly, there are limits imposed by the Constitution on 
legislative power (as well as executive and judicial authority), but as Justice 
Scalia insightfully explained about a balancing test under the Commerce Clause 
of the U.S. Constitution:
The 
problem is that courts are less well suited than Congress to perform this kind 
of balancing in every case.  The burdens and the benefits are always 
incommensurate, and cannot be placed on the opposite balances of a scale without 
assigning a policy-based weight to each of them.  It is a matter not of 
weighing apples against apples, but of deciding whether three apples are better 
than six tangerines.  Here, on one end of the scale (the burden side) there 
rests a certain degree of suppression of interstate competition in borrowing; 
and on the other (the benefits side) a certain degree of facilitation of 
municipal borrowing.  Of course you cannot decide which interest 
“outweighs” the other without deciding which interest is more important to you. 
And that will always be the case. I would abandon the . . . balancing enterprise [used in 
dormant commerce clause cases] altogether. . . . 
 
Dep’t of 
Revenue of Ky. v. Davis, 553 U.S. 328, 359 (2008) (Scalia, J., concurring in 
part) (emphasis added).   
            
Assuming that the Robinsons’ accrued but unliquidated cause of action for 
personal injury is a vested right under the Retroactivity Clause, I consider 
whether the Legislature’s exercise of its general police power outweighs the 
private interests at issue. 
a. The Balancing Test to be Applied
            
We have not had the opportunity to fully discuss the contours of the police 
power exception vis-a-vis a retroactivity challenge.  In Barshop v. 
Medina Underground Water Conservation District, we upheld the Edwards 
Aquifer Act against a retroactivity challenge where landowners above the Edwards 
Aquifer argued that the Act affected their vested right to withdraw unlimited 
amounts of water from the Aquifer.  925 S.W.2d 618, 634 
(Tex. 1996).  Without deciding whether rights to groundwater were 
vested rights, we stated that because the authority was “required for the 
effective control of the [aquifer] to protect . . . life, . . . 
water supplies, the operation of existing industries, and the economic 
development of the state” and the aquifer itself was “vital to the 
general economy and welfare of this state,” that the Retroactivity Clause in the 
Texas Constitution does not “absolutely bar the Legislature from enacting such 
statutes.”  Id. (quoting Act of May 30, 1993, 73d Leg., R.S., ch. 
626 §§ 1.01, 1.06(a), 1993 Tex. Gen. Laws 2355, amended by Act of May 29, 
1995, 74th Leg., R.S., ch. 261, 1995 Tex. Sess. Law Serv. 2505).  In 
In re A.V., we upheld retroactive application of a statute allowing the 
termination of parental rights for those who are incarcerated for an extended 
period of time because the state has a duty to protect the safety and welfare of 
its children, and “[t]his ‘valid exercise of the police power by the Legislature 
to safeguard the public safety and welfare’ is a recognized exception to the 
unconstitutionality of retroactive laws.”  113 S.W.3d 355, 361 (Tex. 2003) 
(quoting Barshop, 925 S.W.2d at 633–34).  In Lebohm v. City of 
Galveston, we struck down a statute providing the City of Galveston a 
complete defense for injury caused by defective roads, streets, sidewalks, or 
other public places within the city limits, noting that “[n]o broad public 
policy or general welfare considerations are advanced to justify the charter 
provision as a reasonable exercise of police power [and w]e can think of none 
that could be advanced inasmuch as the operational effect of the provision 
extends only to the city limits . . . .”  275 S.W.2d 951, 955 (Tex. 1955).
            
Other states, however, have created a fuller rubric for examining the balance 
between the police power and the prohibition against retroactive laws.  
Each formulation seems to balance the nature of the public interest articulated 
by the Legislature, the extent to which the statute modifies or abrogates the 
vested right, the nature of the right the statute alters, and the fairness of 
the application of the new statute.[17]  The Robinsons’ 
retroactivity challenge is an as-applied challenge, and thus the Robinsons must 
demonstrate that the statute is unconstitutional as it operates in practice 
against them.  See Tex. Mun. League, 74 S.W.3d at 
381.  Therefore, it is appropriate to balance the expectations the 
Robinsons lost with the enactment of Chapter 149 against the degree of harm 
sought to be protected by the legislative enactment.
            
When considering the application of the police power, this case is a close 
one.  It does not involve the potential shortage of water for millions of 
people, Barshop, 925 S.W.2d at 634, and it does not involve the state’s 
duty as parens patriae to children, In re A.V., 113 S.W.3d at 
361.  But there are five reasons that Chapter 149 was a legitimate exercise 
of the police power, as applied to the Robinsons.  The first three 
demonstrate that the Robinsons’ expectations in the continued state of the law, 
as-applied, are low.  The second two demonstrate that the Legislature’s 
exercise of the police power was rational, justifiable, and reasonably 
limited.
            
First, at common law, Mr. Robinson’s claims were not “property,” were not 
assignable, and were extinguished when he passed away.  It is only by 
statute that wrongful death claims continue to exist.  The Legislature has 
broad authority to modify rights it creates by statute.  “When a 
right or remedy is dependent on a statute, the unqualified repeal of that statue 
operates to deprive the party of all such rights that have not become vested or 
reduced to final judgment,” and “all suits filed in reliance on the statute must 
cease . . . .”  Quick v. City of Austin, 7 S.W.3d 109, 128 (Tex. 
1998).  This Court has further held that “[i]t is generally conceded 
that a right of action given by a statute may be taken away at any time, even 
after it has accrued and proceedings have been commenced to enforce it.”  
Nat’l Carloading Corp. v. Phoenix-El Paso Exp., 176 
S.W.2d 564, 568 (Tex. 1944).  Even assuming the Robinsons’ acts of 
filing a lawsuit and receiving partial summary judgment resulted in some vested 
expectation, the Robinsons’ claims, based in common law 
negligence and products liability, may continue only because of the statutory 
rights of survival, wrongful death, and successor liability through corporate 
merger.  Accordingly, the Legislature retained discretion to modify the 
nature of their rights through Chapter 149’s restriction on the amount of total 
damages recoverable against Crown Cork.
            
Second, Chapter 149 does not interfere with a claim sounding in contract or a 
claim for an injury to real or personal property, which was protected much more 
stringently at common law.  E.g., Landgraf, 511 U.S. at 271 
(noting that the “largest category of cases in which [the Supreme Court of the 
United States has] applied the presumption against statutory retroactivity has 
involved new provisions affecting contractual or property rights, matters in 
which predictability and stability are of prime importance”).  The 
Robinsons did not have an established relationship with Crown Cork (or even 
Mundet) with predetermined expectations that may have vested upon the occurrence 
of a contractual condition.  Until this litigation, it is unlikely that the 
Robinsons even knew that Crown Cork was a successor to Mundet, or that Mundet 
manufactured asbestos products used in the ships on which Mr. Robinson was 
stationed.  This weakens the expectancy the Robinsons may have had in their 
cause of action.
            
Third, Chapter 149, as applied, does not deprive the Robinsons of their cause of 
action against Crown Cork, and it does not deprive the Robinsons of real and 
substantial remedies for their alleged wrongs.  The Robinsons sued twenty 
other defendants in this case and recovered approximately $850,000 from a number 
of the defendants for their injuries.  They alleged that “[e]ach exposure 
to [asbestos-containing products] cause and/or contributed to Plaintiffs’ injuries . . .” and “[t]he actions of each and 
every Defendant are a producing and proximate cause of Plaintiffs’ injuries and 
damages.”  Thus, the Robinsons lost only the right to recover against 
Mundet/Crown Cork, which had reached its maximum payout under Chapter 149.  
But the statute did not impair their right to seek substantial recoveries 
against other defendants, which were involved in the business of asbestos 
insulation for the same injuries to Mr. Robinson.  There is no vested right 
in a remedy, and the Legislature may retroactively modify remedial laws, affect 
a court’s jurisdiction, or provide alternative procedures or remedies.  
See Tex. Mun. Power Agency v. Pub. Utils. Comm’n, 253 S.W.3d 184, 198 (Tex. 2007); 
David McDavid Nissan, 84 S.W.3d at 219; Ex parte Abell, 613 S.W.2d 
at 260; Mellinger, 3 S.W. at 254.[18]  This case is a multi-defendant 
lawsuit where it is difficult to determine which asbestos products were the 
cause of Mr. Robinson’s injuries. 
            
Chapter 149 does not deprive the Robinsons of any cause of action or prohibit 
their right to sue any party.  It simply cuts off recovery against innocent 
defendants at the point that the defendants have paid out for asbestos-related 
liabilities the fair market value of the assets of the company acquired.  
Importantly, Chapter 149 does not make any defendants immune from suit.  
Chapter 149 limits the remedy under prescribed circumstances.  It is not 
disputed that if, for instance, Mundet’s assets, acquired by Crown Cork, had a 
fair market value of $1 billion, Crown Cork could still be liable for damages in 
this suit.  But because Crown Cork’s asbestos-related liability payments 
exceeded the asset value of Mundet, it had reached the statutory limit for its 
liabilities as successor to Mundet.  Even assuming for the sake of argument 
that the removal of recovery against one defendant in such a suit is not merely 
a change in remedy but a deprivation of a right, in this case the infringement 
was not a complete bar to all recovery for the wrongs alleged.  
Accordingly, the Robinsons were able to proceed against other defendants for the 
same claims based on admittedly the same injury. 
            
Fourth, the Legislature rationally drew Chapter 149 to address a problem it 
perceived as very important—the effects on the Texas economy and employment 
because of the bankruptcy of companies that never manufactured, sold, or 
distributed asbestos-containing products.  The asbestos litigation “crisis” 
had been well recognized in academic journals and even court decisions at the 
time the Legislature debated and enacted House Bill 4.  E.g., Orszag, 44 S. 
Tex. L. Rev. at 
1078–81; Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 598 (1997) (“‘The 
most objectionable aspects of asbestos litigation can be briefly summarized: 
dockets in both federal and state courts continue to grow; long delays are 
routine; trials are too long; the same issues are litigated over and over; 
transaction costs exceed the victims’ recovery by nearly two to one; exhaustion 
of assets threatens and distorts the process; and future claimants may lose 
altogether.’” (quoting Judicial Conference Ad Hoc Committee on Asbestos 
Litigation, Report to the Chief Justice of the United States and Members of 
the Judicial Conference of the United States, at 2–3 (Mar. 1991))); 
Humble Sand & Gravel, Inc. v. Gomez, 146 S.W.3d 170, 203–04 (O’Neill, 
J., dissenting) (recognizing the crisis and noting that “the solution to these 
problems is legislative, not judicial”); Paul F. Rothstein, What Courts Can 
Do in the Face of the Never-Ending Asbestos Crisis, 71 Miss. L.J. 1, 1, 4–9 (2001) (describing 
the “ever-expanding” crisis, and the filing of claims “[o]ver $20 billion and 
thirty bankruptcies later”).  Others examined the potential for unfairness 
when a larger corporation’s assets became susceptible to the stress of asbestos 
liability from a long-since acquired subsidiary.  As stated by one 
commentator:  
[I]n 
asbestos litigation, courts have cast aside the theory behind the [successor 
liability] doctrine.  Instead of limiting the successor corporation’s 
liability to the market value of the acquired corporation, or even to that value 
plus any profits generated by the acquisition, courts have allowed successors to 
be subjected to limitless liability[, which is a] runaway application of the 
successor liability doctrine.
 
Mark H. 
Reeves, Note, Makes Sense to Me: How Moderate, Targeted Federal Tort Reform 
Legislation Could Solve the Nation’s Asbestos Litigation Crisis, 56 Vand. L. Rev. 1949, 1972–73 (2003); 
see also, e.g., Lester Brickman, The Asbestos Litigation Crisis: Is 
there a Need for an Administrative Alternative?, 13 Cardozo L. Rev. 1819, 1831–33 (1992) 
(recognizing that the asbestos litigators invoked successor liability laws “so 
as to reach into the deeper pockets of the companies that bought far smaller 
entities that manufactured asbestos-containing materials regardless of the 
culpability of the purchasing companies”).
            
The Statement of Legislative Intent filed by Representative Nixon recognized an 
“unfairness” existing in corporate merger law where a “larger successor can 
easily be bankrupted by the asbestos-related liabilities it innocently received 
from a much smaller predecessor with which it merged may [sic] decades 
ago.”  H.J. of Tex., 78th Leg., R.S. 6042, 6043 (2003) 
(HB 4 Statement of Legislative Intent).  The Statement also 
recognized that “Corporations actually in the asbestos business and their 
successors through merger have been financially drained by decades of 
litigation.  As a result, nearly 70 such corporations have sought 
protection through bankruptcy.  The cost in jobs and pension benefits, to 
cite just two examples, has been substantial.”  Id. at 6044.  These findings were recognized in 
the House floor during debate, and were codified into the omnibus statute two 
years later that reformulated the method in which asbestos claims are litigated 
in Texas.  See Act of May 19, 2005, 79th Leg., R.S., ch. 97, 
§ 1 (b)–(h), 2005 Tex. Gen. Laws 169, 169–70 (codified at Tex. Civ. Prac. & Rem. 
Code §§ 
90.001–.012).  Protection of Texas’s economy and jobs 
is certainly a rational basis for enacting legislation, and here there is a 
sufficient reason for the Legislature to enact the statute that it did.  

            
Finally, the class of persons protected by the legislation has a rational 
relation to the legislative purpose of the legislation.  The 
Legislature chose to relieve liability on “innocent successors,” companies that 
did not manufacture or sell asbestos, but rather acquired a company that 
did.  And the Legislature mediated the perceived unfairness not by 
foreclosing a remedy altogether, but merely limiting the remedy to the fair 
value of the acquired company’s assets.  Tex. Civ. Prac. & 
Rem. Code §§ 149.001, 
.003.  In this case, that is exactly what 
happened.  Crown Cork’s total liabilities for the asbestos sold and 
manufactured by Mundet far exceeded Mundet’s present-day fair value.  Had 
Mundet never been acquired by Crown Cork, its payouts for asbestos liability 
would have exceeded its value as a going concern, it likely would have been 
bankrupt, and, almost certainly, no money would have remained to pay the 
Robinsons’ claims if they obtained a judgment against it.  See In re 
Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 302–06 
(E.D.N.Y. 2002) (discussing the factual and procedural background of the 
bankruptcy of the Manville Corporation, the establishment of the Manville Trust 
following its bankruptcy to pay asbestos claims, and its reformation once it was 
discovered that the trust was “deeply insolvent” and that beneficiaries would 
not be able to be paid in full, or even paid at all).  Crown Cork chose to 
acquire Mundet through a statutory merger and not through an asset purchase, but 
it remains the purview of the Legislature to modify the legal effect of 
continuing liability of such mergers in Texas to avoid the ruin of businesses 
possessing assets that had nothing to do with asbestos production or 
manufacture.  Importantly, the legislation restricts neither the right nor 
the remedy of plaintiffs who prove that Crown Cork itself caused them injury; it 
only addresses imputed successor liability.
            
In short, for the reasons articulated above, the Robinsons’ interest in their 
accrued, but unliquidated cause of action, is 
low.  Their vested expectancy, if any, is minimal.  Their right of 
recovery for the injuries complained of was not foreclosed.  And their 
relation to Crown Cork was attenuated.  The public interest in the 
legislation, and its retroactivity, is moderate.  The Legislature acted in 
response to a known litigation crisis and acted with a reasonable and narrowly 
tailored response based on the current climate.  Individuals may or may not 
personally believe in the wisdom of the particular legislation, but it is not 
our province to second-guess legislation because we do not agree with its 
policy.  See McIntyre v. Ramirez, 109 S.W.3d 741, 
748 (Tex. 2003). 
b. A Critique of the Court’s Test
            
Although I disagree with the Court’s analytical framework in arriving at its 
three-factor balancing test and the unfoundedly rigorous legal standards it 
applies, I do not wholesale disagree with the categories it has set up to 
determine whether a retrospective law is unconstitutionally retroactive.  
However, the Court’s application of the law to the facts in this case creates 
more difficulties for the Legislature and the courts of our state in reviewing 
retroactive laws, and creates significant and unnecessary impediments to the 
Legislature’s ability to correct law and make beneficial legislative changes in 
the future.
            
First, I disagree with the “compelling reason” standard applied by the 
Court.  Nothing in our precedent, or any case law, requires such a 
heightened review of retroactive legislation.  The Court repeatedly 
mentions the heavy presumption against retroactive legislation, but the 
presumption falls away in this case.  The presumption is removed when a 
legislature “itself has affirmatively considered the potential unfairness of 
retroactive application and determined that it is an acceptable price to pay for 
the countervailing benefits.”  Landgraf, 511 U.S. at 272–73.  
Not only did the Legislature “consider the potential unfairness” in this case, 
it voted to apply Chapter 149 retroactively by a supermajority.  The 
Court’s point that we should view fully retroactive legislation with skepticism 
is well taken; however, the presumption against retroactivity is unnecessary 
when the Legislature expressly concludes that the statute is to be applied 
retroactively.  Id.; accord Lockheed Corp. v. Spink, 
517 U.S. 883, 896–97 (1996) (“[When] the temporal effect of a statute is 
manifest on its face, ‘there is no need to resort to judicial default rules,’ 
and inquiry is at an end.” (quoting Landgraf, 
511 U.S. at 280)); Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 
1281–82 (11th Cir. 2005) (“[The] presumption and analysis, however, are 
unwarranted when Congress states its unambiguous intention that the statute 
apply retroactively to pre-enactment 
conduct . . . .”).  Because it is for the Legislature 
to initially determine whether the benefits of retroactive legislation outweigh 
the detriments (at least to the statute as a whole), we are not commanded to 
review that decision to determine whether their justification was “compelling.” 

            
Second, the Court’s evaluation of the Robinsons’ interest seems to be focused on 
its pretrial evaluation of not only the existence of the Robinsons’ claims, but 
their strength.  The Court argues that the Robinsons’ claims have “a 
substantial basis in fact” and that their claims are “mature tort[s], [such 
that] recovery is more predictable.”  ___ S.W.3d 
___.  I would not require courts in this state to evaluate 
plaintiffs’ claims or defendants’ defenses, under the Retroactivity Clause on 
whether the parties are likely to win or their claims have a “substantial basis 
in fact.”  As any experienced lawyer will acknowledge, the strength of a 
claim and the likelihood of success in litigation may be separate and 
independent things.  This consideration is unwieldy, suggesting that the 
Legislature can enact retroactive legislation affecting substantive rights so 
long as there is a chance that it will not matter, at the end of the day.
            
Third, the statute does not affect settled expectations to the degree alleged by 
the Court.  The Court alleges that the statute will affect the recovery “to 
which the Robinsons are entitled,” once again presuming that the Robinsons’ 
claims against Crown Cork will be successful.  ___ S.W.3d 
___.  As discussed above, the Robinsons had no pre-tort contact with 
Crown Cork, and had no settled expectation that Mundet would be acquired by a 
richer company able to pay for Mundet’s debts. 
            
Fourth, the Court penalizes the Legislature because the legislation does not 
contain expressed “findings to justify Chapter 149.”  ___S.W.3d___.  The Court does not consider the 
well-known facts about the asbestos crisis, Crown Cork’s financial stake, 
subsequently codified legislative findings, or the possibility that other 
businesses may be subjected to financial ruin, as these facts were not included 
in the actual statutory language in House Bill 4.  While I agree that such 
statutory findings are most helpful in determining legislative intent, United 
States v. Lopez, 514 U.S. 549, 562–63 (1995) (concerning the Commerce 
Clause), I am aware of no Texas case that requires them.  And, in fact, if 
the Legislature were to be so required for every bill in which their police 
power may be challenged, certainly the legislative process would be 
significantly burdened.  Rational basis review does not require the 
Legislature to provide any particular purpose; the law will be upheld “if there 
is any conceivable state of facts which would support it.”  Carmichael v. S. Coal & Coke Co., 301 U.S. 495, 509 
(1937).  The law may be valid even if the Legislature did not 
consider the valid purposes, but so long as the purpose “may have been 
considered to be true.”  Nordlinger v. Hahn, 505 
U.S. 1, 11 (1992) (citations omitted). 
            
Thus, I believe it is imprudent to abandon our vested rights jurisprudence, and 
as applied, the Robinsons’ do not have vested rights in their causes of action 
against Crown Cork.  Even if the Robinsons’ claims are vested rights, I 
would hold that, on balance, the Legislature’s exercise of police power 
outweighs the Robinsons’ rights, and thus Chapter 149 does not violate article 
I, section 16 of the Texas Constitution.
B. Special Law
            
Because the Court determines that Chapter 149 is unconstitutionally retroactive 
as applied to the Robinsons, it does not address the Robinsons’ second argument, 
that Chapter 149 is an unconstitutional “special law.”  I would hold that 
it is not.
            
Article III, section 56(b) of the Texas Constitution provides that “where a 
general law can be made applicable, no local or special law shall be 
enacted.”  Tex. Const. art. 
III, § 56(b).  A “special law” is a statute that 
“relates to particular persons or things of a class,” rather than the 
class as a whole.  Clark v. Finley, 54 S.W. 343, 345 (Tex. 1899) 
(emphasis added), cited in Lucas v. United States, 757 S.W.2d 687, 700 
(Tex. 1988); see also Ford Motor Co. v. Sheldon, 22 S.W.3d 444, 456 (Tex. 
2000) (defining a “special law” as one that “impermissibly distinguishes between 
groups on some basis other than geography” (citing Tex. Boll Weevil 
Eradication Found. v. Lewellen, 952 S.W.2d 454, 465 (Tex. 1997))).  The 
prohibition on special laws was added to the Texas Constitution of 1876 as one 
of many practical answers to the prevalent abuse of legislative and executive 
power that occurred in Texas following the Reconstruction.  A.J. Thomas, 
Jr. & Ann Van Wynen Thomas, The Texas 
Constitution of 1876, 35 Tex. L. 
Rev. 907, 915 (1957).  In one session of the post-Reconstruction 
legislature five hundred special laws were passed.  Id.  
Section 56 was thus seen to prevent “logrolling,”[19] to ensure against the granting of 
special privileges, and to prevent lawmakers from trading votes “for the 
advancement of personal rather than public interest.”  Miller v. El Paso 
Cnty., 150 
S.W.2d 1000, 1001 (1941); Sheldon, 22 S.W.3d at 456.
            
In the early twentieth century, the Court developed a test for reviewing whether 
a law providing a privilege to a particular class is in actuality a veiled 
attempt to provide a privilege to a particular member of the class.  See 
Sheldon, 22 S.W.3d at 450–51; Maple Run at Austin Mun. Util. Dist. v. Monaghan, 931 S.W.2d 
941, 945 (Tex. 1996); Robinson v. Hill, 
507 S.W.2d 521, 525 (Tex. 1974); R.H.O, Recent Case, Statutes—Special 
Laws—Reasonableness of Classification, 11 Tex. L. Rev. 134, 134–35 (1932) (collecting 
cases describing the legal standard for review of a special law).  The 
Court first determines whether there is a reasonable basis for the 
classification made by the law, and then determines whether the law operates 
equally on all within the class.  Rodriguez v. 
Gonzales, 227 S.W.2d 791, 793 (1950); Sheldon, 22 S.W.3d at 
451.  Only if the law fails both tests is it a special law and 
unconstitutional.
            
The determination of a “reasonable basis” for the classification is not an 
invitation for the Court to engage in weighing the relative pros and cons of a 
particular policy choice made by the Legislature.  As stated by this Court 
over 100 years ago:
Now, we do 
not propose to be led off into any extended discussion as to what is a proper 
class for the application of a general law.  The tendency of the recent 
decisions upon the subject, as it seems to us, is to drift into refinements that 
are rather more specious than profitable. . . .  To what 
class or classes of persons or things a statute should apply is, as a general 
rule, a legislative question.  When the intent of the legislature is clear, 
the policy of the law is a matter which does not concern the courts.
 
Clark, 
54 S.W. at 345–46.  We do not analyze the Legislature’s classification to 
determine whether the classification is a good or bad idea.  See Smith 
v. Davis, 426 S.W.2d 827, 831 (Tex. 1968).  
Rather we analyze to ensure that the classification is not made to “evade the 
prohibition of the constitution as to special laws by making a law applicable to 
a pretended class, which is, in fact no class . . . .”  Clark, 54 
S.W. at 345.  We presume the statute is valid, and “a mere difference of 
opinion” between the Court and the Legislature will not be sufficient to 
overcome the presumption of validity.  Smith, 426 
S.W.2d at 831.
            
The Rodriguez test’s two-part structure provides the framework to 
determine whether a class is a “pretended class.”  The first part of the 
test examines the delineated class vis-a-vis the purpose of the 
legislation.  Rodriguez, 227 S.W.2d at 
793.  For example, if the purpose of the law is to provide tax 
relief to businesses in the sports entertainment industry, but the tax relief is 
given only to businesses belonging to or supporting teams in leagues or 
conferences with “National” in their name but not with leagues or conferences 
with “American” in their name, the classification would likely have no rational 
relation to the purpose of the statute.  
            
The second part of the test examines whether similarly situated parties are 
treated similarly under the classification, or whether the classification makes 
an irrational category considering the intent of the statute.  See, 
e.g., Rodriguez, 227 S.W.2d at 794 (holding that statute setting out 
special procedures for collecting delinquent taxes on parcels of land greater 
than 1,000 acres situated in counties bordering Mexico and whose title emanated 
from the King of Spain as an unconstitutional special law, as there was “no 
substantial difference in the situation or circumstance of border counties 
relating to suits for delinquent taxes”); Miller, 150 S.W.2d at 1002–03 
(holding as unconstitutional a statute providing an economic development tax 
only in counties meeting population requirements, due to the fact that the 
statute’s classification was not distinct in any substantial manner from other 
counties in the state).  Back to the example, the tax relief statute above 
would likely be unconstitutional, as its effect is to provide relief to the 
Houston Astros and the Dallas Cowboys and the businesses that support them (as 
the Astros are a member of the National League, and the Cowboys are a member of 
the National Football Conference), but would not provide relief to supporters of 
the Houston Texans and the Texas Rangers (as the Texans are a member of the 
American Football Conference and the Rangers are a member of the American 
League).  The classification is a “pretended class” because the 
classification has no relation to the purpose of the law and treats similarly 
situated teams differently.  Although the Court does not defer to the 
Legislature to determine whether a law is general or special, it does defer to 
the Legislature’s policy choices and presumes that law is constitutional. 
 See Smith, 426 S.W.2d at 831; McIntyre v. 
Ramirez, 109 S.W.3d 741, 748 (Tex. 2003) (“Our role here, however, is not to 
second-guess the policy choices that inform our statutes or to weigh the 
effectiveness of their results; rather, our task is to interpret those statutes 
in a manner that effectuates the Legislature’s intent.”).
            
In this case, the purpose of the law has been clearly expressed by the 
Legislature—to eliminate the unfairness created when a corporation merged with a 
smaller corporation that had previously been engaged in the manufacture or sale 
of asbestos is exposed to asbestos liability exceeding the value of the acquired 
corporation, and to save such a corporation from bankruptcy.  H.J. of Tex., 78th Leg., R.S. 6042, 6043 (2003) (HB 4 Statement of 
Legislative Intent).  To address concerns in the Legislature, the 
measure was restricted in three ways.  First, the original transfer of 
liabilities had to occur prior to May 13, 1968.  This was the date in which 
the American Conference of Governmental Industrial Hygienists first adopted a 
change in the recommended threshold limit for asbestos in the air of a 
workplace.  Second, to get the benefit of the legislation, the acquiring 
corporation could not continue in the asbestos business.  Third, if the 
successor continued to control a premises after the 
merger, the successor would continue to be liable for any asbestos-related 
premises liabilities it received from the predecessor for injuries caused on 
those premises. Id. at 6043–44.  
            
The Robinsons attack these limitations as pretexts to limit relief just to Crown 
Cork.  However, it is clear that, regardless of the wisdom of the 
classifications, the classifications are rationally related to the objective of 
the bill.  The act sought to protect “innocent” successor 
corporations.  To define the most “innocent,” the Legislature chose to 
limit mergers occurring prior to May 13, 1968.  The Robinsons claim that 
this date was chosen arbitrarily and that the dangers of asbestos in the 
workplace were known prior to the ACGIH’s modification.  However, this is 
the date decided upon by the Legislature, and it has a rational relationship to 
the legislation—the Legislature could have, no doubt, chosen any number of 
cutoff dates to decide which successor corporations are the most “innocent,” and 
while others may disagree as to the appropriateness of the date, such would 
merely be a “difference of opinion,” and insufficient basis for overturning the 
statute.  Smith, 426 S.W.2d at 831; see also Exxon Mobil Corp. v. 
Altimore, 256 S.W.3d 415, 420–22 (Tex. App.—Houston [14th Dist.] 2008, no 
pet.) (discussing, in the context of the basis for a 
punitive damages award “scientists’ knowledge of the risk to refinery workers” 
of asbestos, and noting studies originating in the 1940s, 1950s, 1960s, and 
1970s).  Similarly, the second and third limitations also seek to limit 
protection to those businesses that were not involved with the manufacture or 
distribution of asbestos, or those that actually had asbestos on the 
premises.  This is also a rational distinction:  The Legislature 
sought to protect those businesses that had nothing to do with asbestos prior to 
a merger, had nothing to do with asbestos after the merger, and had no asbestos 
on its premises.  The classifications are rational.
            
The Robinsons also argue that the law is a “special law” because it created a 
class of one—evidenced by (a) the fact that Crown Cork did not identify any 
other businesses to which the law applied, (b) Crown Cork’s lobbying for the law 
in Texas and other states, and (c) statements by members of the Legislature that 
they were addressing “the Crown Cork and Seal Issue.”
            
The Robinsons cite to Miller’s statement that classification “must be 
broad enough to include a substantial class . . .” to mean that it is the burden of 
the proponent of the law to prove that the law must apply to more than one 
person.  Miller, 150 S.W.2d at 1001.  
On the contrary, the size of the class, itself, is not determinative.  
While courts must be more exacting in reviewing a law that appears only to apply 
to one party, a “substantial” class does not equate to a class with thousands, 
hundreds, or even dozens of members.  There are no doubt many Texas laws 
that apply to a small subset of the population; rather, a “substantial” class is 
one that has substance—a real class of persons or entities, as opposed to a 
“pretended” class created as a pretext.
            
The Robinsons’ evidence of pretext is no evidence at all.  The Robinsons’ 
bare argument that Crown Cork is a “class of one” is insufficient.  First, 
it is not Crown Cork’s, but the Robinsons’ burden to demonstrate that the law is 
a special law.  Second, even if the Robinsons could show that the law 
currently applied only to Crown Cork, that alone would 
not fulfill the burden that the law was special.  As discussed above, the 
Robinsons must show that the classifications made by the Legislature were not 
rationally related to the objective of the law, and the Robinsons must show that 
the legislation has treated a similarly situated successor company differently 
from Crown.  They have done neither.
            
The only other evidence the Robinsons provide is evidence of legislative 
history.  The Robinsons argue that the law is special because Crown Cork 
lobbied for the act and that at least one legislator called the Act the “Crown 
Cork issue” in a committee hearing.  This evidence is also 
unavailing.  First, as a beneficiary of this law, Crown Cork would 
certainly lobby for its enactment.  But then again, public interest groups, 
individuals, and businesses regularly lobby for legislation that affects them 
directly or as an industry, and lobbyists regularly draft legislation for 
legislators.  See, e.g., Victoria F. Nourse & Jane S. Schacter, 
The Politics of Legislative Drafting:  A Congressional Case Study, 
77 N.Y.U. L. Rev. 575, 583, 587, 
591 (2002) (noting a number of responses by legislative aides that lobbyists 
regularly draft the text of bills debated in the Senate Judiciary Committee and 
discussing an account by a legislative aide where a companion bill was 
“negotiated and drafted by lobbyists and introduced with only ‘minor 
changes’”).  Many involved in the “sausage making”[20] task of developing law use lobbyists to 
draft the text of bills because lobbyists provide valuable information and 
perspective on the bills being introduced.  Id. at 
583.  Cognizant as I am of the need to avoid the gifts given by the 
Legislature to favored individuals, the Robinsons must come up with more 
evidence than the mere fact that Crown Cork was involved in the passing, or even 
the drafting, of the act in question.
            
Likewise, the Robinsons’ evidence of Senator Ratliff’s statement is also not 
evidence of House Bill 4’s “special law” status.  The senator described 
Article 17 as “the Crown Cork and Seal asbestos issue.”  First, the 
statement is no evidence because, as this Court has repeatedly stated, a single 
statement by a single legislator does not evidence legislative intent and does 
not determine legislative intent.  E.g., 
AT & T Commc’ns of Tex., L.P. v. Sw. Bell Tel. Co., 186 
S.W.3d 517, 528–29 (Tex. 2006); Gen. Chem. Corp. v. De La Lastra, 852 
S.W.2d 916, 923 (Tex. 1993).  Second, to countenance this statement 
as even “persuasive authority as might be given the comments of any learned 
scholar of the subject,” De La Lastra, 852 S.W.2d at 923, would be to do 
a disservice to the legislative process.  Countless laws are either 
championed by a particular person or entity or arise out of the circumstances 
that will be or have been experienced by an individual or a business.[21] 
        In sum, the 
Robinsons meet neither of the factors in the Rodriguez test.  The 
Robinsons have not shown that the Legislator’s classifications are irrational or 
not related to the objective of the statute, nor have they shown that the 
Legislature has created a “pretended” class by excluding similarly situated 
entities.  
III. CONCLUSION
            
I would hold that Chapter 149 is not an unconstitutional special law, and is not 
unconstitutionally retroactive as applied to the Robinsons because the law 
limited available remedies and did not destroy the Robinsons’ vested 
rights.  I therefore respectfully dissent.
 
                                                                                    
_______________________________________
                                                                                    
Dale Wainwright
                                                                                    
Justice
 
OPINION DELIVERED: October 
22, 2010






[1] 
            
The term “statutory merger” is used to distinguish business mergers made 
pursuant to the statutory scheme of the state of incorporation from other, 
nonstatutory forms of combinations, for example asset-purchase and 
stock-purchase transactions.  20A Robert W. Hamilton, Elizabeth S. Miller, & 
Robert A. Ragazzo, Texas Practice 
Series:  Business Organizations § 43.2 (2d ed. 
2004).

[2] 
 The House also defeated an amendment making 
the bill applicable only to successor liabilities assumed or incurred after the 
effective date of the act.  H.J. of Tex., 78th Leg., R.S. 
818–19 (2003).

[3] 
The act also provides a number of exceptions, 
excluding, among other things, workers’ compensation claims, an insurance 
corporation, a claim made in a bankruptcy proceeding begun prior to April 1, 
2003, claims for premises liability, or claims against a “successor that, after 
merger or consolidation, continued in the business of mining asbestos or in the 
business of selling or distributing asbestos fibers or in the business of 
manufacturing, distributing, removing, or installing asbestos-containing 
products which were the same or substantially the same as those products 
previously manufactured . . . by the transferor.”  Id. § 149.002(b).

[4] 
The Robinsons’ remedies against the other 
defendants pending at the time of the enactment of the statute was not limited by Chapter 149, but their remedy against 
Crown Cork was.  The Robinsons eventually recovered at least $850,000 from 
other defendants sued in addition to Crown Cork.

[5] 
On November 16, 2003, after the trial court 
entered its amended order granting summary judgment, John Robinson died.  
Mrs. Robinson continued to prosecute her claims individually and as 
representative of the estate of John Robinson.  Because the claims still 
live independently, one for Mrs. Robinson and one for the estate of John 
Robinson, this opinion will refer to petitioners as the 
Robinsons.

[6] 
The Court astutely notes that, due to the odd 
procedural posture of the case, as well as Mr. Robinson’s untimely passing, it 
is unclear which legal claims are being allegedly retroactively 
extinguished.  Because the parties raise only 
whether Chapter 149 is unconstitutionally retroactive as applied to Mr. 
Robinson’s common law claims (kept alive through the survival statute and 
pursued derivatively through the wrongful death statue) I, as the Court, address 
only those arguments.  However, as more fully discussed below, the fact 
that the Robinsons’ claims are statute-based reinforces the conclusions of this 
vested rights analysis.

[7] 
See also Milam Cnty. v. Bateman, 54 Tex. 153, 163 (1880); Moore v. Letchford, 35 
Tex. 185, 222 (1871) (Ogden, J., dissenting) (noting that the Legislature may 
pass retrospective legislation that “would regulate” and neither“create nor 
destroy vested rights” (emphasis added)); Hamilton v. Avery, 20 Tex. 
612 (1857); Nichols v. Pilgrim, 20 Tex. 426, 428–29 (1857) (discussing 
whether an executed contract for the sale of land was a “vested right” allowing 
suit for partition of land, notwithstanding the enactment of the statute of 
frauds).

[8] 
See, e.g., Landgraf v. USI Film Prods., 511 U.S. 244, 272 
(1994) (recognizing that the “constitutional impediments to retroactive 
civil legislation are now modest”); see also Hochman, 73 Harv. L. Rev. at 717 & n.135 
(“[T]he Court has many times sustained the application of a retroactive statute 
to an accrued cause of action.” (citing Louisville & Nashville R.R. v. 
Mottley, 219 U.S. 467 (1911))).

[9] 
Hammond v. United States, 786 F.2d 8, 12 (1st Cir. 1986) (“The question whether 
the rights asserted in plaintiff’s state-law causes of action are ‘vested’ 
cannot be answered by looking to see whether suit had already been 
filed . . . .  No person has a vested interest in any 
rule of law [and] this is true after suit has been filed and continues to be 
true until a final, unreviewable judgment is obtained.” (citations and 
quotations omitted)); In re TMI, 89 F.3d 1106, 1115 n.9 (3d Cir. 1996) 
(distinguishing cases holding accrued causes of action to be vested rights, 
calling them “contrary to current federal constitutional precedent that finds no 
vested right in a tort cause of action before final judgment); Zeran v. Am. 
Online, Inc., 129 F.3d 327, 335 (4th Cir. 1997) (“No person has a vested 
right in a nonfinal tort judgment . . . .”); Arbour v. 
Jenkins, 903 F.2d 416, 420 (6th Cir. 1990) (quoting Sowell); 
Konizeski v. Livermore Labs, (In re Consol. U.S. Atomospheric Testing 
Litig.), 820 F.2d 982, 989 (9th Cir. 1987) (quoting Hammond); 
Grimesy v. Huff, 876 F.2d 738, 743–44 (9th Cir. 1989) (reviewing vested 
rights cases under a Fifth Amendment takings analysis); Taxpayers for the 
Animas-La Plata Referendum v. Animas-La Plata Water Conservancy Dist., 739 
F.2d 1472, 1477–78 (10th Cir. 1984) (holding that “inchoate” rights, such as the 
right to pursue legal remedies are not “vested” for purposes of the Colorado 
state and federal constitutions);  Salmon v. Schwartz, 948 F.2d 
1131, 1143 (10th Cir. 1991) (quoting Arbour and Sowell); Sowell 
v. Am. Cyanid Co., 888 F.2d 802, 805 (11th Cir. 1989) (“The fact that the 
statute is retroactive does not make it unconstitutional [because] a legal claim 
affords no definite or [enforceable] property right until reduced to a final 
judgment.”); see also Lunsford v. Price, 885 F.2d 236, 240–41(5th Cir. 
1989) (holding the applicability of a statute to pending claims was not 
manifestly unjust); Garcia v. Wyeth-Ayerst Labs., 385 F.3d 961, 968 (6th 
Cir. 2004) (noting that Michigan statute of repose, which “prevent[s] causes of 
action from accruing” did not violate retroactivity provisions of the federal 
constitution); Symens v. SmithKline Beecham Corp., 152 F.3d 1050, 1056 
n.3 (8th Cir. 1998) (noting that federal regulations, which may preempt state 
law claims would apply to plaintiffs’ tort and implied warranty claims “because 
plaintiffs had no vested rights in these unasserted claims at the time [the] 
preemption was modified” (citing Landgraf, 511 U.S. at 269, 273)).  
But see Davis v. Blige, 505 F.3d 90, 103 (2d Cir. 2007) (recognizing, in 
a copyright case applying patent law, that a retroactive assignment destroys an 
owner’s “valuable and vested right to enforce her claim”); Hoyt Metal 
Co. v. Atwood, 289 F. 453, 454–55 (7th Cir. 1923) (deciding whether a 
judgment is to be accorded the status of a vested right and stating 
“[t]hat an accrued cause of action is a vested property right is well 
settled . . . . Certainly a judgment is a vested property 
right.”); De Rodulfa v. United States, 461 F.2d 1240, 1257 (D.C. 
Cir. 1972) (indicating that “a vested cause of action, whether emanating from 
contract or common law principles, may constitute property beyond the 
power of the legislature to take away,” but not so holding because no cause of 
action—interference with contract—existed in the case (emphasis 
added)).

[10] I concede 
that a majority of other states to directly address the issue have held that an 
accrued, yet unliquidated cause of action is a “vested right” under either 
retroactivity or due process analyses.  However, a number of other states 
provide a more nuanced view.  For example, Colorado, one of the 
jurisdictions whose constitution also includes a prohibition on retroactive 
legislation, has held that a “vested right” is “one that is not dependent 
on the common law or statute but instead has an independent existence.” In re Estate of DeWitt, 54 P.3d 849, 853 (Colo. 
2002).  The Colorado Supreme Court would determine this “independent 
existence” by balancing:  “(1) whether the public interest is advanced or 
retarded; (2) whether the statute gives effects to or defeats the bona fide 
intentions or reasonable expectations of the affected individuals; and (3) 
whether the statute surprises individuals who have relied on a contrary 
law.”  Id.  Nonetheless, the court, and the state’s lower 
courts, do not recognize that an accrued cause of action is a vested right per 
se.  City of Greenwood Vill. v. Pets. for the 
Proposed City of Centennial, 3 P.3d 427, 445–46 (Colo. 2000) 
(“[C]ontemporary precedent also demonstrates that expectations of parties to 
litigation are not equivalent to vested rights.”); see also Miller v. 
Brannon, 207 P.3d 923 (Colo. App. 2009) (“A vested right must be a contract 
right, a property right, or a right arising from the transaction in the nature 
of a contract which has become perfected to the degree that it is not dependent 
on the continued existence of the statute or common law.” (emphasis added) (quotations 
omitted)).  

[11] 
 See Houston Indep. Sch. Dist. v. Houston 
Chronicle Publ’g Co., 798 S.W.2d 580, 589 (Tex. App.—Houston [1st Dist.] 
1990, writ denied); see also Walls v. First State Bank of Miami, 900 
S.W.2d 117, 122 (Tex. App.—Amarillo 1995, writ denied) (holding that retroactive 
application of federal law shielding employees of a financial institution for 
reporting suspected wrongdoing was properly applied to lawsuit for malicious 
prosecution and defamation that had been filed prior to the enactment of the law 
and stating that “only final, nonreviewable judgments will be accorded the 
dignity of vested, constitutionally guarded rights, and a law will be deemed to 
have a prohibited retroactive effect only when it impairs those rights”); 
Tex. Gas Exploration Corp. v. Fluor Corp., 828 S.W.2d 28, 32 (Tex. 
App.—Texarkana 1991, writ denied) (“A party has no vested right to a cause of 
action; neither the Constitution of the United States nor this state forbids the 
abolition of common-law rights to attain a permissible legislative objective.”); 
Aetna Ins. Co. v. Richardelle, 528 S.W.2d 280, 285 (Tex. Civ. App.—Corpus 
Christi 1975, writ ref’d n.r.e.) (noting that even though a plaintiff’s cause of 
action had accrued against a minor child, the plaintiff could not proceed 
because the Legislature amended the statute to foreclose recovery against 
children the defendant’s age and the plaintiff “had not acquired a ‘title . . . to the present or future 
enforcement of a demand’” (quotations omitted)); ain Satterfield v. Crown 
Cork & Seal Co., 268 S.W.3d 190, 221–41 (Tex. App.—Austin 2008, no pet.) 
(Law, C.J., dissenting) (noting that the 
plaintiffs  had no vested right in the successor liability remedy against 
Crown because vested rights are “certain and immediately enforceable,” the 
successor liability theory does not create a cause of action, and economic 
interests could be considered in police power balancing).  But see 
Satterfield, 268 S.W.3d at 206–09 (holding that plaintiff in asbestos suit 
had vested rights in accrued cause of action).

[12]  The 
Open Courts Clause of the Texas Constitution, not at issue in this case, may 
impose limitations on the extent to which unliquidated claims may be barred. 
 Tex. Const. art. I, § 13; Sax v. 
Votteler, 648 S.W.2d 661, 665–66 (Tex. 1983) (holding that the “right to 
bring a well-established common law cause of action cannot be effectively 
abrogated by the legislature absent a showing that the legislative basis for the 
statute outweighs the denial of the constitutionally-guaranteed right of 
redress”); see also Walters v. Cleveland Reg’l Med. Ctr., 307 S.W.3d 292, 
295 (Tex. 2010).

[13] Justice Medina, citing Ex parte Abell and quoting 
Mellinger, alleges that the Retroactivity Clause “goes beyond federal 
guarantees of property and due process.” ___ S.W.3d ___ (Medina, J., 
concurring).  While Abell recognized that proposition, it did so 
while simultaneously recognizing that “[i]n practice . . . retroactive lawmaking has not 
been viewed as the gross abuse of power once assumed.”  Ex parte 
Abell, 613 S.W.2d at 259–60.  Further, commentators and jurists from 
other states have more recently recognized that specific retroactivity clauses 
should not be read overly broadly.  See, e.g., 1 George D. Braden, The Constitution of the 
State of Texas: An Annotated and Comparative Analysis 58 (1977) (“The 
other prohibition concerning ‘retroactive laws’ seems to spring from a general 
suspicion regarding all retroactive laws of which the three mentioned [ex post 
facto, bills of attainder, and laws impairing the obligation of contracts] were 
notorious examples.  Early judicial restriction of the scope of ex post 
facto laws to retroactive criminal laws may have prompted a desire to 
re-establish the broader sweep, which the prohibition had in the minds of some 
people, by general condemnation of retroactive laws.”); see also id. 
at 59 (discussing the Mellinger dicta also 
quoted by Justice Medina and 
commenting that the authoring justice’s argument “excluded not only the specific 
guarantees of section 16 but the due course of law limitation as well.  
Although he perceived the growing scope of due process of law at the time of his 
opinion, Justice Straton could not have foreseen its remarkable subsequent development . . . .  Thus, it has 
been said that laws are retroactive in the sense of section 16 only when they 
contravene another specific prohibition of the Constitution.”); Bryant Smith, 
Retroactive Laws and Vested Rights, 5 Tex. L. Rev. 231 (1926) (noting that, 
in most states at the time, the explicit retroactive law provisions in other 
states’ constitutions were coterminous with due process).  Regardless of 
whether the Retroactivity Clause in section 16 deserves a broader read than just 
due process, there is nothing in the text of the Constitution to suggest that it 
should apply to contingent expectancies such as exist in this 
case.

[14] The causation 
question to the jury may have listed ten potential defendants, the number 
remaining at the time Crown Cork’s partial summary judgment motion was 
granted.

[15]  Justice Medina 
argues that the final judgment rule is 
inappropriate because “it is the right to sue itself—the lawsuit—that is being 
taken away, not the final outcome.”  ___ S.W.3d ___ (Medina, J., 
concurring).  On the contrary, the Robinsons sued Crown Cork.  There 
were pleadings, discovery, and motion practice.  Crown Cork had to prove 
that it was entitled to the Chapter 149 defense, which it did through summary 
judgment.  In fact, if Crown Cork’s prior payout had been below Mundet’s 
fair value, the Robinsons could recover against Crown Cork, but that question 
must be established in the lawsuit.  To the extent there is an expectation 
to file and prosecute a cause of action (and not to recover on a claim), that 
expectation was satisfied in this case.  

[16] The Robinsons 
also argue that article I, section 29 of the Texas Bill of Rights, compels that 
result.  I agree with the Court that section 29 does not determine whether 
and how the substantive portions of the Bill of Rights apply.  ___ S.W.3d ___.  Furthermore, section 29 is generally 
cited only for the proposition that courts have the power to declare laws 
unconstitutional.  1 Braden 
at 86–87, cited in Oakley v. State, 830 S.W.2d 107, 110–11 (Tex. 
Crim. App. 1992); cf. Travelers Ins. Co. v. Marshall, 76 S.W.2d 1007, 
1011 (Tex. 1934) (citing to section 29, among other things, to depart from the 
U.S. Supreme Court’s view and declare unconstitutional a law impairing the 
obligation of contracts); see also City of Beaumont v. Bouillion, 896 
S.W.2d 143, 148–49 (Tex. 1995) (“Section 29 has been interpreted as follows: any 
provision of the Bill of Rights is self-executing to the extent that anything 
done in violation of it is void.”); Republican Party of Tex. v. Dietz, 
940 S.W.2d 86, 89–91 (Tex. 1997) (analyzing section 29 and holding that the 
Texas Bill of Rights protects against government, not private, 
conduct).
 

[17] E.g., 
Phillips, 608 A.2d at 902 (articulating a similar test balancing:  
“(1) the nature and strength of the public interest served by the statute, (2) 
the extent to which the statute modifies or abrogates the asserted right, and 
(3) the nature of the right that the statute alters” and discussing whether the 
application of the statute would result in “manifest injustice”); Estate of 
DeWitt, 54 P.3d at 855 (balancing the vested right against public health and 
safety concerns, the state’s police powers to regulate certain practices, and 
other public policy concerns, so long as there is a rational relationship 
between the government interest that is asserted and the retroactive 
legislation); Marriage of Bouquet, 546 P.2d at 1376 (examining “the 
significance of the state interest served by the law, the importance of the 
retroactive application of the law to the effectuation of that interest, the 
extent of reliance upon the former law, the legitimacy of that reliance, the 
extent of actions taken on the basis of that reliance, and the extent to which 
the retroactive application of the new law would disrupt those actions”); 
Reed v. Brunson, 527 So. 2d 102, 115–16 (Ala. 1988) (eliminating 
co-employee lawsuits, while noting that “[i]t is certainly within the police 
power of the legislature to act to enhance the economic welfare of the citizens 
of this state [by eliminating the common law cause of 
action]. . . in an attempt to eradicate or ameliorate what it 
perceives to be a social evil”); Mergenthaler v. Asbestos Corp. of Am., 
534 A.2d 272, 276–77 (Del. Super. Ct. 1987) (noting that the determination of 
retroactivity “rests on subtle judgments concerning the fairness of applying the 
new statute” and noting that the considerations of vested rights “may be 
moderated or overcome if the statute is in furtherance of the general police 
power for concerns of public, health, morals, safety, or general welfare” and 
holding retroactive application of workers’ compensation benefits to asbestos 
claimants who were exposed prior to coverage was not unconstitutionally 
retroactive).

[18] Courts have 
repeatedly recognized that a statute depriving a court of jurisdiction to hear a 
dispute does not implicate a vested right.  David McDavid Nissan, 84 
S.W.3d at 220; In re A.D., 73 S.W.3d 244, 249 (Tex. 2002); see also 
Landgraf, 511 U.S. at 274 (recognizing that statutes that confer or oust 
jurisdiction are regularly applied retroactively).  If the mere right to 
sue were the constitutionally protected interest, then the Robinsons would have 
it, and those whose claims were no longer justiciable in a court of competent 
jurisdiction would not.  Therefore, the right protected by the 
Retroactivity Clause must truly be focused on the substance of the claim—the 
actual recovery—rather than the right to get to a recovery.

[19]  “Logrolling” has been defined by our Courts of 
Appeals as “the inclusion in a bill of several subjects having no connection 
with each other in order to create a combination of various interests in support 
of the whole bill,” Skillern v. State, 890 S.W.2d 849, 861 (Tex. 
App—Austin 1994, no writ) (citations omitted), and “trading votes to advance 
personal rather than public interests,” Diaz v. State, 68 S.W.3d 680, 684 
(Tex. App.—El Paso 2000, pet. denied).

[20] “Laws, like 
sausages, cease to inspire respect in proportion as we know how they are 
made.”  John Godfrey Saxe, as quoted in The Yale Book of Quotations 86 
(2006).  This quotation has previously been attributed to Otto von 
Bismarck.  See id.; In re Graham, 104 
So. 2d 16, 18 (Fla. 1958).

[21] No one could 
claim that the Brady Handgun Violence Prevention Act of 1993, 18 U.S.C. 
§ 921–22, advanced by former White House Press Secretary James Brady and 
his wife Sarah, or the proliferation of Megan’s Laws, e.g., N.J. Stat. § 2C:7-1 to 11, dealing with 
sex offender registration throughout the country, named after Megan Kanka, a 
minor who was sexually assaulted in New Jersey, or even the Copyright Term 
Extension Act, which was sometimes known as the “Mickey Mouse Act,” because 
Disney lobbied extensively for the act and because the act prevented the 
original Mickey Mouse cartoon “Steamboat Willy” from entering the public domain, 
see Ben Depoorter, The Several Lives of Mickey Mouse:  The 
Expanding Boundaries of Intellectual Property Law, 9 Va. J.L. & Tech, no. 4, Spring 2004, at 3 n.2, would be special laws merely 
because an individual, or even Disney, lobbied for them so strenuously that the 
bill was eventually named for them.